**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| COLLEEN M. BRADLEY, | : | |
| | : | |
| Plaintiff, | : | No. _____ |
| | : | |
| v. | : | |
| | : | |
| WEST CHESTER UNIVERSITY OF THE | : | |
| PENNSYLVANIA STATE SYSTEM OF | : | |
| HIGHER EDUCATION, | : | **JURY TRIAL DEMANDED** |
| MARK MIXNER, | : | |
| LAWRENCE A. DOWDY, | : | |
| DR. GREGORY R.  WEISENSTEIN, | : | |
| DR. MARK G. PAVLOVICH, | : | |
| PENNSYLVANIA | : | |
| STATE SYSTEM OF HIGHER EDUCATION, | : | |
| LOIS M. JOHNSON, | : | |
| GINGER COLEMAN, | : | |
| | : | |
| Defendants. | : | |

## COMPLAINT

Plaintiff Colleen M. Bradley ("Ms. Bradley"), by and through her attorneys, Edward S. Mazurek and Daniel J. Kearney, files this Complaint and avers as follows:

## PRELIMINARY STATEMENT

1.      In this lawsuit, Ms. Bradley is seeking to vindicate her rights under the First Amendment to the United States Constitution, the Pennsylvania Whistleblower Law, and other state laws.  Ms. Bradley's rights were violated with respect to her speech regarding matters of the highest public concern – misuse and waste of public funds by high-level state government officers - speech that was suppressed and chilled through retaliatory acts by Defendants. Those retaliatory acts arose directly in response to Ms. Bradley's efforts to bring to the public's attention and rectify a scheme she had discovered under which the conspiring Defendants

1

knowingly and willfully executed, repeatedly and over a period of at least three years, and under knowingly contrived and misleading pretenses, to acquire, misappropriate, misuse, mismanage and waste millions of dollars in Pennsylvania taxpayer funding, while those same Defendants made every effort, including bullying, harassing, ignoring, demeaning, coercing and intimidating Ms. Bradley and ultimately terminating Ms. Bradley's employment, to conceal from the public their ongoing pattern of malfeasance with respect to taxpayer funding.

2.      Defendant West Chester University of Pennsylvania of the State System of Higher Education ("WCU or "System Institution") and Defendant the State System of Higher Education ("PASSHE" or the "System"), and each of the individual Defendant employees of the System named in this Complaint, knowingly and willfully, individually and collectively, presented, and repeatedly sought, unsuccessfully to coerce Ms. Bradley into presenting false budgets to the Commonwealth, which willfully and falsely understated WCU's actual operating surpluses over at least three years, to fraudulently maintain or increase taxpayer-funded appropriations made to WCU.  The Defendants presented false break-even or near-break-even budgets to the Commonwealth over three years, during which time and as a result of such false and misleading budgets, WCU received in excess of $146 Million in taxpayer-funded appropriations. Despite presenting these break-even budgets year after year, WCU's general and education fund net assets increased by $56.6 million, or over 100%, during the three-year period.

3.      Defendants' year-after-year scheme to understate actual operating surpluses to increase taxpayer-funded appropriations far above appropriations to which WCU would have been entitled had it submitted truthful budgets was executed through the willful overstatement of one expenditure line item on budgets submitted to the Commonwealth for taxpayer funding – "Transfer to Plant."   In governmental or university accounting amounts designated to the Transfer to Plant expenditure line item are management's representation or commitment, after

judicious consideration, that those funds are needed for anticipated plant or facility maintenance or improvement expenditures.  In this case, Defendants deliberately manipulated this number each year to increase it to an amount that would reduce large surpluses into moderate surpluses or deficits that Defendants had calculated would allow WCU to maintain or increase its taxpayer-funded appropriations.  In addition, substantial funds included within the Transfer to Plant line item theoretically designated for plant and facility maintenance or improvements expenditures were actually accounted for by WCU and WCU Defendants as reserved for unrestricted use by the WCU divisions or departments that had generated the surpluses being transferred to Plant. Attached hereto as Exhibit 1 is a spreadsheet explicating in a summary format the financial fraud and waste that Defendants engaged in during the 2012 budget season that Ms. Bradley vocally opposed.  The same or substantially similar scheme was executed by Defendants during each annual budget cycle during the three-year period, which Ms. Bradley consistently and relentlessly vocally opposed.

4.     In addition to increasing appropriations, there were other motives for the Defendants to submit false budgets and understate anticipated and actual operating results. Doing so increased their leverage in negotiations with the Association of Pennsylvania State College and University Faculty ("APSCUF") and other unions representing faculty and other university staff.

5.     In addition, the taxpayer funds that were procured purportedly for so-called anticipated plant maintenance expenditures misrepresented in the budgets were not spent by WCU on those items year after year during the period.  Rather, these funds were squirrelled away, which positioned WCU to substantially increase its unrestricted net assets to potentially secede from the Commonwealth and transition to state-related status under Senate Bill 1275 (the "Secession Bill") sponsored on March 12, 2014 by Senator Robert Tomlinson, a member of

WCU's Council of Trustees ("WCOT"), and Senator Andrew Dinniman, a WCU graduate. Under the Secession Bill, if passed as sponsored, WCU would be able to purchase from the Commonwealth WCU land and buildings at depreciated book value.  Had WCU spent the taxpayer funds represented in the budgets to be needed for building and plant maintenance and improvements, the buildings would be worth significantly more than they are.  By not spending the funds earmarked for building and plant maintenance and improvements, the buildings have depreciated and declined in value.  Thus, cash needed to purchase buildings has declined making it cheaper for WCU to purchase the land and buildings at depreciated book value.

6.      In around June 2014, WCU directed its leaders to respond to inquiries by following a carefully crafted script that falsely painted WCU as a mere bystander concerning the Secession Bill, when in fact for months preceding the introduction of the Secession Bill, WCU's Council of Trustees had been holding secret meetings and WCU senior administrators, including each WCU Defendant, had been conducting meetings and preparing documentation including budgets that supported the Secession Bill, without Ms. Bradley's knowledge.   In addition, the WCU Foundation had engaged a lobbyist to support the Secession Bill without a public meeting.

7.      In addition to the foregoing motives, the individual WCU defendants also stand to enjoy significant personal financial gains should WCU transition from State-Owned to State-Related Status.  Officer compensation of State-Related university officers is approximately twice that or more than twice that of State-Owned universities like WCU.  Therefore, individual WCU defendants have acted to misuse taxpayer funds for their personal financial gain.

8.      Ms. Bradley is a lifelong resident and taxpayer of the Commonwealth of Pennsylvania, as well as the mother of a child that attended WCU during Ms. Bradley's employment at WCU, as well as the mother of three other children whom she hoped and expected would attend WCU.  Ms. Bradley was appointed in November of 2011 as WCU's

Director of Budget and Financial Planning and chief budgeting officer, based on her skills, career success and advancement and twenty years of experience in finance and accounting.

9.    Repeatedly during her employment at WCU, Ms. Bradley expressed to the Defendants her concerns and objections to, and refusals to participate in (despite being repeatedly bullied and coerced to do so), the false, deceptive and manipulated budgets submitted by the defendants to the Commonwealth.  Less than three weeks after expressing her most recent complaints about the deceptive practices to WCU University Leaders outside of Ms. Bradley's chain of command at a meeting of WCU's Enrollment Management Committee in late October of 2014, Ms. Bradley was notified by her immediate supervisor, defendant Mark Mixner ("Mixner"), WCU's Chief Financial Officer, that her employment at WCU would terminate June 30, 2015, under the pretext that WCU needed "to seek a different kind of leadership."  Mixner cited numerous other fabricated performance deficiencies in purported justification for Ms. Bradley's termination, despite the facts that Mixner himself had consistently rated Ms. Bradley as a very high performer in her three annual written performance evaluations he delivered to her, the last of which he provided to her approximately four weeks before her speech to the WCU Enrollment Management Committee concerning WCU's manipulative budget practices. Contrary to Mixner's false and contrived asserted reasons for Ms. Bradley's termination, the termination was in retaliation for Ms. Bradley's exercise of her First Amendment Rights and for reporting fraud and waste pursuant to the Pennsylvania Whistleblower Law, as well as for her steadfast refusal to follow their repeated instructions to engage in unlawful conduct.

10.    As a result of the Defendants' wrongful actions, Ms. Bradley has suffered economic harm, damage to her reputation and earning capacity, as well as physical and emotional pain and suffering manifested in, among other things, two outbreaks of shingles and chronic intestinal distress, that, to date, have resulted in two medical  leaves of absence. Ms.

Bradley is currently undergoing treatment for stress-induced anxiety disorders resultant from the retaliation to which she was subjected by the Defendants.

## THE PARTIES

11.     Plaintiff Ms. Bradley is an adult individual and citizen of the United States and the Commonwealth of Pennsylvania and resides in Garnet Valley, Delaware County, Pennsylvania.

12.     Ms. Bradley has been a System and WCU employee as WCU's Director of Budget and Financial Planning since November of 2011.

13.     WCU has notified Ms. Bradley that her employment as a System employee at WCU will terminate effective as of June 30, 2015.

14.     WCU  is a publicly funded institution of higher learning that is a member university of the System.  WCU's principal administrative office is located at 700 S. High Street, West Chester, Pennsylvania 19382.

15.     The System and WCU are public bodies and employers within the meaning of the Pennsylvania Whistleblower Law, 43 P.S. § 1421 *et seq*. ("PWL").

16.     Dr. Gregory R. Weisenstein ("Weisenstein" or the "President") is a System employee and the President and Chief Executive Officer of WCU.  He is responsible for, *inter alia,* developing WCU's strategic plan, establishing its policies, managing its day-to-day operations, and presenting WCU's operating budgets to WCU's Council of Trustees ("WCOT") for approval.

17.     Defendant Lawrence A. Dowdy ("Dowdy"), at all times relevant to this action until his retirement at the end of 2014, was a System employee and Executive Deputy to the President at WCU and was a Member of WCU's Administrative Budget Committee ("ABC"),

the committee responsible for making recommendations to the President concerning WCU's operating budget.

18.     Defendant Mark Mixner ("Mixner") is a System employee and VP of Finance and Administration and Chief Financial Officer at WCU and serves as a voting member of the ABC. Mixner was Ms. Bradley's immediate supervisor in connection with her employment at WCU. The President is Mixner's immediate supervisor.

19.     Defendant Dr. Mark G. Pavlovich ("Pavlovich") is a System employee and Vice President of Advancement and Sponsored Research and a voting member of the ABC.

20.     Defendants President, Dowdy, Mixner and Pavlovich are hereafter collectively referred to as "WCU Defendants").

21.     Defendant System is the Commonwealth agency responsible for governing the Commonwealth's fourteen public universities.  It is located at 2986 North 2nd Street, Harrisburg, Pennsylvania 17110.

22.     Defendant Lois M. Johnson ("Johnson") is a System employee and the Associate Vice Chancellor for Administration and Finance in the Office of the Chancellor of the System, responsible, *inter alia*, for budgeting.   Ms. Johnson reports to the Chancellor of the System.

23.     Defendant Ginger Coleman ("Coleman") is a System employee and Manager – Budget Planning/Analysis, for Administration and Finance in the Office of the Chancellor of the System, responsible for budgeting.  Defendant Coleman reports to Johnson.

## JURISDICTION AND VENUE

24.     Jurisdiction is invoked pursuant to 28 U.S.C. §§1331 and 1367.

25.     Venue before this Court is proper because the events or omissions giving rise to the claims occurred within this this Court's jurisdictional limits.  28 U.S.C. § 1391(b)(1).

## FACTUAL BACKGROUND

26.     WCU is the largest of the fourteen System controlled state universities in Pennsylvania, having enjoyed continuous and substantial enrollment growth for at least the past ten years.

27.     Under Act 188 of 1982, 24 P.S. §§ 2-2001A, *et seq.* ("Act 188"), WCU is charged with providing high-quality education at the lowest possible cost to its students.

28.     Based in part on her twenty years of experience and career advancement in finance and accounting, on November 1, 2011, Ms. Bradley was appointed as WCU's Director of Budget and Financial Planning at an annual starting salary of $101,471.33.  A true and correct copy of Ms. Bradley's appointment letter referenced in this paragraph is attached as Exhibit 2.

29.     The Job Description for Ms. Bradley's position described her duties as chief budget and financial planning officer to include (a) reporting to Mixner and working with him on all WCU budget and financial planning matters; (b) responsibility for long-term financial planning, and for preparation, oversight, and management of the operating budget; (c) interacting with key financial and budget personnel from PASSHE; (d) working collaboratively with a wide range of senior leaders at WCU; and (e) being a member of and providing support for WCU's Administrative Budget Committee ("ABC"), the primary recommending body to the President for budget issues.  A true and correct copy of Ms. Bradley's job description referenced in this paragraph is attached as Exhibit 3.

30.     Ms. Bradley was willing to leave her then-current position as Chief Financial Officer of The Westtown School, where she was earning an annual salary of $143,000 and enjoyed other benefits, in part because it would provide her four children the opportunity to receive a tuition-free education at WCU.  Ms. Bradley's eldest child attended WCU during Ms. Bradley's employment.

31.    On November 21, 2011, Michael Maloy ("Maloy"), WCU's Associate VP of Human Resources and chief human resources and labor relations officer, emailed Ms. Bradley to determine how she was doing in general and how her relationship was developing with Bernadette Hinkle, CPA and WCU's Assistant VP of Finance ("Hinkle").  In her responses, Ms. Bradley expressed that she was doing well, she thought highly of Hinkle, and hoped to be able to spend more time working collaboratively with her to better align the finance and budgetary functions of WCU.

32.    Ms. Bradley also expressed to Maloy her perception that her knowledgeable and passionate colleagues at every level were disheartened, frustrated, and beaten down by an environment that colleagues described as dysfunctional, unsupportive and unrealistic.  The recurring theme among colleagues was that the President and ABC set goals without seeking input from those impacted by those decisions.  Ms. Bradley expressed hope to facilitate change and that positive change could be made through broader communication and decision making that would build trust and integrity among stakeholders.

33.    Maloy responded that he saw "a cultural belief here that decisions around money equal power – and power must be kept to a select few.  For years I have asked why the chief human resources and labor relations officer has no input into ABC decisions on 'people' spending, given the fact that 'people' expenditures constitute the lion's share of the university budget.  The response I've received from senior administrators is that if I participated I would find it both boring and frustrating.  So it is by favor that I'm being spared the abuse of my time….  Our strategic planning in general solicits broad input on important matters – which is promptly ignored.  The *real* process operates outside those more public feedback opportunities.  There is a lot of good here, but participative leadership isn't one of those good things."

(emphasis supplied).  A true and correct copy of the November 21, 2011 email exchange between Maloy and Ms. Bradley described in this paragraph is attached hereto as Exhibit 4.

34.     On February 21, 2012, Ms. Bradley was promoted to Manager 210 level, and her salary was increased 15% from $101,471.33 to $116,692, effective February 20, 2012.  A true and correct copy of the promotion letter referenced in this paragraph is attached as Exhibit 5.

35.     On May 2, 2012, Ms. Bradley held a meeting among the Budget, Finance and Business Services Departments to enhance communication and streamline processes. More specific agenda items included preparation for WCU Council of Trustees ("WCOT") reporting, and in particular, timing and ownership of transfers, ensuring all transfers were captured, prevention of backdating transfers after WCOT reporting, reconciliation of the Plant Fund, Clarity of Transfer of Budget Dollars, Clarity of Actual Expenses to Cost Center.

36.     On May 18, 2012, Ms. Bradley convinced Mixner of the need for a Position Budget Management software application ("PBM").  Roughly 80% of the budget was employee compensation, which WCU was then managing, and tracking positions, with Microsoft Excel and a static software system that was riddled with errors.  The PBM would automate and make more accurate and efficient position budget management.  Implementation of the PBM would be a major initiative for the WCU Budget Department, and it would need support from other departments given the decentralized management model in place, and Mixner's support would be important to gain other department support.

37.     On June 18 and 19, 2012, Ms. Bradley implemented a process to require sponsors of employee promotions to identify approved funding sources before promotions were presented for approval by the President (eleven promotions approved by the President had been presented to her without approved funding sources).  She expressed concern to Mixner "about how loose

and unorganized our budget/fiscal area is operating." She added "in order to implement sound practices and work most effectively, I need to be informed and understand expectations."

38.     From June 25 to June 27, 2012, Ms. Bradley was asked to approve new cost/fund centers without any documentation.  She coordinated with Hinkle to define and refine process. Ms. Bradley emailed Mixner an email string concerning the process to keep him "informed of the various processes [she was] seeking to develop good internal controls, best business practices, and inclusiveness in the decision making process."   She also noted that "[c]ommunication and transparency will be key as changes are happening."

39.     On June 30, 2012, Ms. Bradley received her first Manager Performance Evaluation from Mixner covering the period from November 1, 2011 to May 24, 2012.  The performance evaluation scale on the form contemplated a rating scale between 1 and 3, whereby 1 represented performance "Below Expectations," 2 represented "At or Above Expectations," and 3 represented "Significantly Exceeds Expectations."  Raters had the option to rate at values between 1 and 2 and 2 and 3.  Mixner rated Ms. Bradley an excellent overall score of 2.71 and excellent ratings in all categories:  Leadership: 2.8; Commitment to the University's Mission, Vision and Values: 2.8; Management Practices: 2.7; Relational Skills: 2.8; Resource Management, 2.8; and Communication Skills: 2.6.  A true and correct copy of Ms. Bradley's June 30, 2012 Performance Evaluation referenced in this paragraph is attached as Exhibit 6.

40.     Mixner added to the Performance Evaluation that Ms. Bradley "stepped into a very difficult situation when she assumed the position of Director of Budget and Financial Planning last Nov.  The long-time Budget Director and one of two other staff members had recently left the office, and there was inadequate documentation to help with Ms. Bradley's transition. Nevertheless, she has approached the challenges with perseverance and patience…. Ms. Bradley brings good problem-solving intuition and skills to the University and already has

made significant progress in understanding the major budget issues."  Mixner added that for his part, he would help with Ms. Bradley's acclimation "by bringing definition to budget issues that are approved by the President … and by facilitating communication that flows from the President, vice president, and deans related to budget and financial issues."

41.     As part of her self evaluation, Ms. Bradley noted the following:  "Currently I am trying to understand the best way to proceed regarding the budget process.  I would like to implement a budget that implements resources in an effective and transparent way.  Critical decisions would require an assessment and collaborative communication.  It is yet to be determined if this environment or culture will support such a model."  Tellingly, the President would echo Ms. Bradley's then-expressed goal at a WCOT meeting in 2015 following Ms. Bradley's notice of termination, a significant benefit to be provided by a budget consultant brought in shortly after the decision to terminate Ms. Bradley was made as described in greater detail of Paragraph 188 of this Complaint.

42.     On August 10, 2012, Ms. Bradley emailed Mixner concerning an $18 million dollar surplus amount that Hinkle mentioned at a recent WABC meeting.  The number did not reconcile with an amount entered in the budgeting department by Ms. Bradley's predecessor. Ms. Bradley had determined that a multimillion dollar adjustment entered in the budget department system had not been entered in the SAP accounting system, and that had created Hinkle's misunderstanding.  Mixner asked Ms. Bradley to clarify the misunderstanding at the next ABC meeting and complimented her as follows:  "I can't emphasize enough how fortunate we are to have you on board.  You really are addressing the budget issues head on.  We may have a few bumps in the transition process, but I'm confident the end result will serve the University much better than our current process."  A true and correct copy of the August 10,

2012 email exchange between Mixner and Ms. Bradley referenced in this paragraph is attached as Exhibit 7.

43.    In early to mid August, 2012, Ms. Bradley was becoming increasingly aware and concerned with discrepancies between surpluses contained in financial and budget reports that were being presented to the WCOT and what she believed to be WCU's actual surpluses.  In preparation for an upcoming WCOT meeting in September, she had received a financial report intended for the WCOT that was reporting a surplus that was much lower than that budgeted as well as what she understood the actual surplus to be.

44.    By email dated August 15, 2012, Ms. Bradley expressed her concern about the surplus discrepancy in an email to Mixner by stating that "[t]he entire presentation is so misleading that I [sic] embarrassed and personally I don't want to take responsibility for this report. I would suggest showing the transparent version of what we really made and present this format, so that our trustees understand the actual year-end results.  It would make me more comfortable to start conversations now with the Finance Committee and get their feedback." Mixner replied to Ms. Bradley's email as follows, "[l]et me think about this dilemma at least overnight."  A true and correct copy of the August 15, 2012 email exchange between Mixner and Ms. Bradley referenced in this paragraph is attached as Exhibit 8.

45.    Concerned, Ms. Bradley shared the August 15 Mixner email exchange with Chris Fiorentino ("Fiorentino"), WCU's Dean of Business and Public Affairs, a senior dean with influence and a member of ABC, whom Ms. Bradley viewed as a mentor.  She stated in the email seeking Fiorentino's thoughts that the "COT would see the 'EOY Report for COT' and the reported surplus # is completely arbitrary."  Fiorentino replied by email as follows: "Traditionally, the reports to COT have been more art than science.  I have sat at presentations wondering how they could distort the facts so much and get away with it.  The fact is that the

COT is more of a symbolic body than a governing body.  The BOG s [sic] the real governing body.  You expressed your concern to Mark [Mixner] in writing, so I would suggest that you view this as something that will take a little time to change….  You are making a difference, but we can't fix everything at once."    A true and correct copy of the August 15, 2012 email exchange between Fiorentino and Ms. Bradley is attached as Exhibit 9.

46.    Later that day, Ms. Bradley sent Mixner another email forwarding a budget scenario for 2013. She noted that if they were going to continue the practice of including year-end surpluses in the Operating Expenditure Line, they needed to project it appropriately and make it a part of the base projection.  The then-current model did not have projected surplus built in, consequently, the following year when Ms. Bradley would report numbers she would appear incompetent. She suggested building in the transfer presently and designating the surplus to specific projects or deferred maintenance accounts.  It would be part of WCU's financial sustainability category within the strategic financial plan.  She also proposed to make the budgeting process more transparent, right sized, result in more accurate projections and more accurately identify actual surpluses, eliminate personnel rollovers, have processes for budget increases, productivity models to measure performance, as well as other suggestions.

47.    Mixner responded by email in which he stated he was "developing a concept paper regarding a budget allocation process, which generally is consistent with your points below. I will share with you next week.  The real trick is to get the key players on board."

48.    Ms. Bradley replied and asked who the key players were, to which Mixner replied as follows:  "[b]eyond the President, probably the most important person is Linda Lamwers (and by extension the college deans).  Chris Fiorentino, as the senior dean, obviously has significant influence with his colleagues. After that, I would say Larry Dowdy, and Mark Pavlovich. Ideally, though, I would also like to have Matt Bricketto and Adel Barimani on board."  A true

and correct copy of the August 15, 2012 email exchange between Mixner and Ms. Bradley referenced in the paragraphs above is attached as Exhibit 10.

49.     On August 17, 2012, Mixner emailed Ms. Bradley and advised her that he spoke with the President concerning several budget issues.  With respect to the End of Year Report for the WCOT, the President believed they needed to transfer most of the surplus to "Plant" (as theoretical operating expenditures), explain in general terms this transfer in the narrative (which Mixner would handle), and show a bottom line surplus of approximately $2 million (which would correspond roughly to the surplus in the budget at the beginning of the year).  With respect to the 2012-2013 budget, they would have more dialogue at the ABC meeting the following week.  A true and correct copy of the August 17, 2012 email from Mixner to Ms. Bradley referenced in this paragraph is attached as Exhibit 11.

50.     On August 19, 2012, in an email to Hinkle, Ms. Bradley informed Hinkle that the President wished to show a $2 million surplus, consistent with the amount budgeted, in the WCOT report, rather than the approximately $581,000 in surplus that Hinkle was showing.  Also, the FIN Report, a report of financial condition filed with PASSHE, might need to be adjusted, because the FIN Report and WCOT Reports were always consistent.  A true and correct copy of the August 19, 2012 email from Ms. Bradley to Hinkle referenced in this paragraph is attached as Exhibit 12.

51.     On August 20, 2012, Hinkle emailed Ms. Bradley, copy to Mixner and other team members, and requested a meeting before close of business.  Her team had agreed to give the auditors a final FIN Report in two days.    Hinkle believed that a journal entry to transfer back surplus into E&G ("Education & General") was complicated.  "That would create a red flag for the auditors and PASSHE" since the first FIN Report and subsequent trial balances would not reflect the desired amount.  Hinkle was also concerned that by moving surplus back to E&G,

they would lose sight of the surplus in E&G since "politically seeing a $1 million plus surplus in E&G after the state cut WCU the preceding year by $4 million plus would indicate WCU could do without more state appropriation, and the reserves in the plant were distinct and tangible."  A true and correct copy of the August 20, 2012 email from Hinkle to other team members referenced in this paragraph is attached as Exhibit 13.

52.     Hinkle also sent an email to Mixner stating that in order for the year-end surplus to be over what was projected and reflected on the COT Report, there would need to be a $2 million adjustment of year-end surplus from plant fund reserves (fund center – department rollover reserves) to E&G fund center.  Since she was not privy to year-end surplus discussions or ramifications, Hinkle assumed that that was the number upon which Mixner and the President agreed.  She added, "in past practices, Kevin routinely left approximately $500k in E&G, moving the remainder to Plant reserves."  A true and correct copy of the August 20, 2012 email from Hinkle to Mixner referenced in this paragraph is attached as Exhibit 14.

53.     Ms. Bradley forwarded the email string to Fiorentino for input, stating that "[t]his is absolute insanity . . ..   Who is on first and what should our surplus be?  Should it have any correlation to what COT has approved?  BH said she didn't even think about our COT Budget. Wow, I really don't even know where to begin with all this nonsense. Just keeping you in the loop to get a 'reasonable' check."

54.     Fiorentino replied that "[a]pparently, accounting is more art than science.  The Director of Finance is more worried about the 'political ramifications' of how we report numbers rather than making sure that we report them correctly.  I am speechless.  Just make sure you keep copies of your recommendations so you are not dragged down with them."  A true and correct copy of the August 20, 2012 email exchange between Ms. Bradley and Fiorentino referenced in this paragraph is attached as Exhibit 15.

55.     On August 23, 2012, Mixner presented to ABC a Proposed Budget Model.  He reviewed a brief history of the budgeting process at WCU.   Internally, WCU employed a Distributed Budget Model.  In this Model, each department or division was allocated a portion of the overall budget.  If a surplus was generated by a department or division, it was considered a "rollover" or rollover surplus and was added to a division's rollover fund balance, available to or "owned" by that division or department.  Eventually over the years, these surpluses, or rollover fund balances, began to accumulate to the point that in the aggregate the departmental rollover balances were approximately $30 million at one point.  In the spring of 2011, ABC identified $9 million from divisional rollover balances that were redirected to a fiscal stabilization fund to help WCU weather possible reductions in state funding.  However, the President directed that ABC implement a temporary moratorium on capturing further rollover balances.  In Fall 2011, ABC developed a process for capturing funds from non-teaching positions that had been vacant for 12 or more months.  Recaptured unused salary funding would be reverted to the central budget to be used as directed by the President.  A true and correct copy of the Mixner Proposed Budget Model referenced in this paragraph is attached as Exhibit 16.

56.     For public reporting purposes, surpluses that were moved internally to rollover fund balances were transferred to the Plant Fund, an expenditure account theoretically maintained for anticipated building and facility maintenance.

57.     In addition to the significant issue of having funds designated for different purposes depending on whether the designation was for internal purposes versus public reporting purposes, each department's budget each year was not adjusted to reflect actual expenditures from the preceding year.  Budgets for an upcoming year started with the base budget from the preceding year, with adjustments for anticipated cost increases.

58.     Mixner's proposed changes included looking at actual expenditures as the major component of budget funding, providing incentive funding for accomplishment of key performance indicators ("KPIs"), and allowing divisions to request special initiative funding, perhaps in support of achieving KPIs.

59.     Mixner posed the question of how rollover balances should be treated, noting that significant funding would be needed in the next ten years for major facilities improvement and implementation of the strategic plan.  "With the likelihood of declining resources from the state, rollover balances (or a large part of those balances) could be used to fund construction of new facilities and implementation of the Strategic Plan."  Id.

60.      At this stage in her WCU acclimation process, Ms. Bradley encountered another major challenge.  She began the process of preparing what is known as the PASSHE Budget Report (the "Bud Report").

61.     As a State-owned university, WCU enjoys the benefit of appropriations from the State of Pennsylvania, or State taxpayer funding, to help meet its statutory requirement to provide high-quality education at the lowest possible cost to students.   These annual appropriations, as well as the annual appropriations of the other thirteen PASSHE universities, are based on annual budgets that WCU and the other universities submit to PASSHE, in the form of a Bud Report, which PASSHE reviews, requests adjustments from the universities, and then consolidates in summary form for review and approval of the PASSHE Board of Governors ("BOG").  Once approved by the BOG, the overall budget is submitted to the Budget Office of the Governor of Pennsylvania, who in turn submits the budget to the legislature for approval.

62.     During the three fiscal years 2012, 2013, 2014, WCU received a total of over $146 million in taxpayer-funded appropriations, while appropriations to all PASSHE universities during that period exceeded well over $1 billion.

63.     Given the absence of any documentation or internal know-how concerning the preparation of the Bud Report, Ms. Bradley requested that Mixner authorize funding to engage her predecessor, Ms. Boucher, as a consultant to assist with the process.  Mixner expressed reluctance on the purported grounds that it would hurt Ms. Bradley's credibility.  Ms. Bradley pushed back in an email in which she expressed frustration concerning the unorthodox way the Budget and Finance divisions had been conducting business, practices of random and manual entry of data with no documentation, complete failure of succession planning despite years of notice concerning Boucher's retirement, and lack of knowledge at the ABC level concerning budget preparation, among other concerns.  She stressed that she should not be held accountable for the lack of succession planning.  She expressed confidence she could fix the broken model, but needed support and maintenance of credibility that was vital to success.

64.     Ms. Bradley emailed Fiorentino on August 26, 2012 to seek his advice concerning misrepresentations contained in meeting materials for a WCOT meeting to be held September 6, 2012 that Mixner had sent to WCOT members August 24, 2012 without Ms. Bradley's review. The materials contemplated that certain inserts had not been included because of the Budget Office's emphasis on budget development for 2012-2013, when the truth was that one insert had not been completed due to the Finance department's indecision on how to present year-end surplus and the other insert was awaiting decisions from ABC.

65.     Fiorentino replied, "I would tell Mark that this is not accurate and that you do not appreciate being thrown under the bus to cover the failure to get this done.  I would also take the opportunity to comment on how Finance has impacted your ability to get work done…. The thing that annoys me, though, is that Mark chose to assign blame inaccurately to cover his own failures."  A true and correct copy of the August 26, 2012 email exchange between Ms. Bradley and Fiorentino referenced in this paragraph is attached as Exhibit 17.

66. On August 27, 2012, Ms. Bradley followed Fiorentino's advice and emailed Mixner and very directly pointed out the inaccuracies in his representations concerning the Budget Office to the COT. She requested that she be given the opportunity to review any communications concerning the Budget Office before publication. She also expressed that the community should be aware that it was not "business as usual" in the budget office; a major paradigm shift was in process above and beyond the Budget Office that was straining the Budget Office's limited resources. Mixner did not respond to that email. A true and correct copy of the August 27, 2012 email from Ms. Bradley to Mixner referenced in this paragraph is attached as Exhibit 18.

67. On August 29, 2012, Ms. Bradley emailed Mixner the Budget Strategy tab for the Bud Report. Her predecessor Boucher had informed Ms. Bradley that Mixner typically took the worksheet to ABC to complete, and Ms. Bradley asked how he wanted to handle it now.

68. On August 30, 2012, Mixner replied to Ms. Bradley's August 29 email by informing her he was willing to lead the discussion at ABC. He noted, however, that they should not say they are reducing budget because they have consistently increased enrollment and would increase enrollment again this year. In many cases they did not provide positions and other support to adequately serve those students. They had also brought new buildings online and would continue to do so. He closed by expressing "[s]ome of my colleagues may say we still need to play PASSHE's game, but I will push for a little more connection to reality." A true and correct copy of the August 30, 2012 email from Mixner to Ms. Bradley referenced in this paragraph is attached as Exhibit 19.

69. At a meeting of the ABC that took place on September 20, 2012, Ms. Bradley, who at that time was facilitating ABC meetings, reported to the ABC her concerns about instructions she had received from Defendants Johnson and Coleman from PASSHE regarding

preparation of the Bud Report.  Johnson and Coleman had requested that she show a $2-3 million deficit for the upcoming 2013-2014 budget year and a break even for the year just ended.  She had provided to each ABC member a financial packet in which she had included the PASSHE FIN Report and WCOT Report that each showed a $2.1 million surplus, as well as a worksheet that showed the actual surplus of $13.4 million (before the transfer to plant entries).  The surplus was actually $18.1 million if one added back the McDermott Drive payoff.  Ms. Bradley expressed her view that it would be unethical to comply with Johnson's and Coleman's request and she asked for ABC's guidance.

70.    Both Mixner and ABC member Pavlovich were very clear that they could not show a deficit balance.

71.    Mixner agreed to discuss the matter with Lois Johnson.  A true and correct copy of the minutes of the ABC meeting held on September 20, 2012, as well as the financial packet Ms. Bradley had delivered to ABC members is attached as Exhibit 20.  While it was customary for Mixner to include financial handouts delivered to ABC members with proposed minutes that would in an upcoming meeting be submitted to ABC members for review and approval, in this case Mixner chose not to do so.

72.    Shortly after that meeting, Mixner reprimanded Ms. Bradley for using the term "unethical" at the September 20 ABC meeting.  Mixner said it hurt Ms. Bradley's credibility with the group and suggested she needed a mentor like Dowdy or Fiorentino.  Ms. Bradley informed Mixner she did discuss the matter in advance with Fiorentino, in whom Mixner then expressed great disappointment.

73.    Thereafter, Mixner removed Ms. Bradley as facilitator of ABC meetings, a roll he assumed until 2013 when Dowdy assumed the role.  Dowdy frequently interrupted or shut down

Ms. Bradley during meetings and referred to the major position budget management, or PBM software she was implementing as "PMS," an acronym for premenstrual syndrome.

74.     On September 24, 2012, Mixner filed the Bud Report with PASSHE fraudulently showing a $2.3 million deficit for Request Year 13-14.  The deficit was accomplished through an approximately $4.5 million arbitrary increase to the Transfer to Plant line item in the Bud Report.  A true and correct copy of the Bud Report submitted to PASSHE by Mixner referenced in this paragraph is attached as Exhibit 21.

75.     At the September 27, 2012 ABC meeting, Mixner reported to the ABC on how he handled the Bud Report issue. He reported that he had spoken to Lois Johnson at PASSHE who said "that WCU show [sic] a balanced budget [instead of a deficit as directed by PASSHE] for the 2013-2014 request, but doing so would send a message to the Board of Governors that WCU does not need any additional tuition or appropriation funding.  Based on that discussion, Mixner adjusted the report and submitted it to PASSHE with a deficit of approximately $2.25 million for the request year of 2014."  A true and correct copy of the minutes of the ABC meeting held on September 27, 2012 is attached as Exhibit 22.  That deficit was achieved by showing the same amount of transfers to plant for capital projects as WCU showed in the budget report for 2012-2013.  Id.

76.     At the same meeting, Ms. Bradley provided a memorandum to each ABC member in which she confirmed her advice to them at the September 20 meeting that she had serious concerns with respect to the PASSHE Bud Report process.  Those concerns included Ginger Coleman instructing her to not show the $2.1 E&G surplus in the FY11-12 column.  Coleman also instructed her to change a proposed balanced 2013-14 budget into a $2-3 million deficit by increasing the transfers to plant line item.  Coleman had advised Ms. Bradley that the PASSHE Bud Report was only for funding purposes and would not correlate to actual internal budgets.

Ms. Bradley informed Coleman she was not comfortable with the instruction because it did not reflect WCU's true financial condition.  When Ms. Bradley refused to falsify the 2013-14 budget after reviewing it with Mixner, Mixner did so and submitted the report in Ms. Bradley's name. Ms. Bradley strenuously objected to the submission and the whole reporting process.  She asked that the report be resubmitted in Mixner's name. She noted "I have openly and cooperatively been seeking answers to authenticate the data, but have not received any response.  In the meantime, it has been explained to me that my actions last week have endangered my credibility and I find this hugely disappointing due to I am seeking truth and trying to perform my job with integrity and honesty."  A true and correct copy of Ms. Bradley's Memorandum referenced in this paragraph is attached as Exhibit 23.

77.     On October 1, 2012, Ms. Bradley emailed a detailed list of questions to Ginger Coleman at PASSHE concerning how to complete the PASSHE Budget Report.  Those questions included: (1) what is the appropriate use of transfers to plant for capital projects or deferred maintenance; (2) was there a maximum amount that could be so allocated; (3) did PASSHE do any reconciliation of the SAP trial balance for the various funds; and (4) did anyone at PASSHE ever look at previous Reports and compare them to actual year end performance?  She also questioned why the instructions required the template to balance.  Because the information was being provided for state funding, Ms. Bradley wanted to make sure she was not doing anything wrong.  Ms. Bradley confirmed Coleman's advice that budgeting "was an art, not a science," and Coleman's advice that the PASSHE budget report would not resemble WCU's actual internal budget, as each served different purposes, one for funding, the other for operating. A true and correct copy of the October 1, 2012 email from Ms. Bradley to Coleman referenced in this paragraph is attached as Exhibit 24.

78.     On October 2, 2012, Coleman responded via email and expressed that she and Johnson would be happy to answer her questions in a face-to-face meeting that could take place in either Harrisburg or at WCU, "rather than going back and forth in lengthy emails."  A true and correct copy of the October 2, 2012 email from Coleman to Ms. Bradley referenced in this paragraph is attached as Exhibit 25.

79.     After Ms. Bradley's list of questions in the October 1 email, Coleman emailed Ms. Bradley on October 3, 2012 asking her for examples of some of the deferred maintenance projects that would be done that year trying to explain what the $33 million in capital and transfers would be used for in both FY 12/13 and FY 13/14.  A true and correct copy of the October 3, 2012 email from Coleman to Ms. Bradley referenced in this paragraph is attached as Exhibit 26.

80.     Ms. Bradley forwarded Coleman's October 3 email to Mixner on October 3, 2012 asking him to respond and explaining that she objected to the entire exercise because the "transfer number was forced to show the deficit balance as requested by Ginger to maintain our funding."  (emphasis supplied).  A true and correct copy of the October 3, 2012 email from Ms. Bradley to Mixner referenced in this paragraph is attached as Exhibit 27.

81.     Mixner responded by email to Coleman on October 3, 2012 stating that Ms. Bradley had "referred your message to me, since I am in a better position to respond." (emphasis supplied).  He then provided Coleman with a schedule of expenditures prefaced by his statement that he had listed the major facilities needs over the next "two or three years" that "we believe we will have to fund ourselves."  A true and correct copy of the October 3, 2012 email from Mixner to Coleman referenced in this paragraph is attached as Exhibit 28.

82.     Act 188 of 1982, 24 P.S. §§ 2-2001A, *et seq.* ("Act 188"), states that the BOG shall "coordinate, review, amend and approve … the annual operating budgets of the individual

24

institutions."  Under Act 188, the BOG has adopted Policy 1993-03: Budgetary Reporting and Review (hereafter the "BOG Budget Policy"), under which universities are required annually to submit a Budget Report to the Division of Finance and Administration of the Office of the Chancellor (hereafter the "DFAOC"), in a form established by the Chancellor, containing revenue, expenditure and supporting data for the prior fiscal year, current fiscal year, and the request fiscal year.  The BOG Budget Policy provides further that the university submissions shall be shared in summary form with the BOG, and the BOG's review shall include assumptions for tuition rates and associated revenue, appropriations, and other sources of revenue, as well as expenditure projections for the future fiscal year.  A true and correct copy of the BOG Budget Policy is attached as Exhibit 29.

83.     In addition, under Act 188, in accordance with the rules and regulations of the BOG, the WCOT has a duty to review and approve the recommendations of the President the annual operating budget requirements for forwarding to the BOG.  Moreover, under Act 188 the President has the duty to prepare and, after review and action by the WCOT, submit to the Chancellor the annual operating budget requirements for WCU.  From 2012 through 2014, the President never submitted, and the WCOT never reviewed and approved, the Bud Reports presented to the Chancellor and BOG.

84.     In fact, annual operating budgets for WCU for Request Years were never submitted to the WCOT until after appropriations had been approved and awarded to WCU in June immediately preceding the Request Year.  The annual operating budgets for Request Years were not submitted to the WCOT until September of the Request Year.  Such annual operating budgets differed materially from the Bud Reports for the Request Year submitted to the State for appropriation purposes.  Attached as Exhibit 30 is the Report submitted by Mixner to the WCOT during September 2012 that purports to show actual operating results for WCU's fiscal year

ended June 30, 2012, as well as the operating budget for WCU's fiscal year ending June 30, 2013.  See Exhibit 1 for a summary of the malfeasance engaged in by Defendants in connection with budgets presented to WCOT and the Bud Reports.

85.    It was not until after Ms. Bradley received her notice of termination that the individual Defendants presented the Bud Report to the WCOT.

86.    The President and the WCOT breached their duties under Act 188 to review and approve budgets submitted to the State from 2012 to 2014.

87.    Not only did the individual Defendants fail to present the Transfers to Plant plug in numbers to the WCOT, they acted to conceal that item from the WCOT.  In Ms. Bradley's draft Fiscal Year 2012 Statement of Revenue and Expenses, Ms. Bradley characterized the transfer to plant item as "Year End Transfers to Plant."  A true and correct copy of Ms. Bradley's draft is attached as Exhibit 31.  In the final version submitted to the WCOT, Mixner changed that characterization to "Facilities and Strategic Sustainability."  See Exhibit 30.

88.    In October, 2012, Ms. Bradley was diagnosed with shingles and three weeks medical leave was recommended by her physician's assistant.  Ms. Bradley worked part time during this period.

89.    On November 28, 2012, Johnson and Coleman met with Ms. Bradley at WCU to discuss Ms. Bradley's concerns that she had raised in her October 1, 2012 email referenced in paragraph 77 above.  During this meeting, PASSHE Defendants advised that the Transfers to Plant were funds designated for capital projects.  They also pointed out that the Bud Report was not audited or subject to the Pennsylvania Right to Know Law.

90.    On May 6, 2013, Ms. Bradley received a merit based increase in her salary of $3,734, bringing her annual salary to $120,426, due to her positive job performance.

91.    On May 8, 2013, Fiorentino was promoted to VP of External Operations.

92.     On June 11, 2013, Ms. Bradley emailed Mixner in response to a meeting she had with him earlier that day in which he informed her that he and his ABC colleagues did not think she was "the right fit" for WCU, and that he was purportedly concerned about her work-life balance.  She apologized for showing emotion during the meeting and expressed her shock and disappointment at Mixner's input.  She expressed her views that many improvements had been made, she was working her tail off to research and resolve all challenges that were preventing timely deliverables, and she had never complained about the extra hours she was putting in.  She asked for more specifics concerning not being "the right fit."  Despite her disappointment, she committed to continue to perform at her high standards.

93.     Mixner replied and acknowledged he knew Ms. Bradley was working her tail off. According to Mixner, that made the conversation especially tough and he stated that he wished he could have waited several months to see if "the conversation" was even needed, but with the new appointment letters, "the conversation" could not wait.  Ultimately, Mixner stated that he and Ms. Bradley should "put [their] heads together to plan for success," and recommended Chris Fiorentino as a mentor for Ms. Bradley noting that Fiorentino would give her honest feedback. Mixner complimented Ms. Bradley on her professionalism.  A true and correct copy of the June 11, 2013 email exchange between Ms. Bradley and Mixner referenced in this paragraph is attached as Exhibit 32.

94.     Ms. Bradley received a letter dated June 26, 2013 from Maloy reappointing her as "Budget Director" (an error in title) of WCU for a two-year term expiring June 30, 2015.  In the letter, Maloy stated "I value the leadership you have provided to the University and appreciate your contributions, dedication and ability.  You are a key member of the University's Management Team and I have the utmost confidence in your ability to further advance the mission of the University."  Ms. Bradley signed and returned the letter on July 2, 2013.  A true

and correct copy of the June 26, 2013 Maloy letter referenced in this paragraph is attached as Exhibit 33.

95.     On July 11, 2013, Maloy emailed Ms. Bradley and explained the June 26, 2013 reappointment letter had an error regarding the term. It was supposed to be a one-year term ending June 30, 2014 pursuant to an earlier conversation Ms. Bradley allegedly had with Mixner. A revised letter with a one-year term was provided, which Ms. Bradley refused to sign.  A true and correct copy of the July 11, 2013 email from Maloy to Ms. Bradley referenced in this paragraph is attached as Exhibit 34.

96.     Mixner then emailed Ms. Bradley to tell her that the two-year appointment would be honored.  He claimed that his intent behind the one-year appointment was to give both of them an opportunity to assess in the late December early January timeframe Ms. Bradley's progress, growth and development and whether the position "is the right fit for your talents."  He stated he still wished to have that discussion and asked for annual and mid-year objectives.  He pledged to continue his "support."

97.     On August 28, 2013, Ms. Bradley received her second written performance evaluation from Mixner.  She again received high marks with and overall score of 2.62 out of 3.0 -- a score of 2.0 meaning that performance was at or above expectations and 3.0 meaning that performance significantly exceeded expectations.  With respect to Ms. Bradley's interactions with ABC, Mixner's advice was "[r]emember your audience and their needs and level of understanding; tailor your presentations to your audience."  "Especially in dealing with the Administrative Budget Committee, you will want to bring forward only the top priorities, and in a manner that meets the needs of the committee members.  Generally, those individuals are looking for a general understanding of key issues, instead of detailed information."   A true and

correct copy of Ms. Bradley's Performance Evaluation referenced in this paragraph is attached as Exhibit 35.

98.     Mixner's overall assessment of Ms. Bradley's performance was as follows:  "I recognized that you have faced numerous challenges during the year, including taking leadership for a new budget process, limited institutional knowledge in the Budget Office after the previous director's retirement, complications from numerous and retroactive salary adjustments. However, through the whole process, you have shown that you are conscientious, tenacious, and committed to producing a quality product for the University." Id.

99.     On September 20, 2013, Ms. Bradley emailed Mixner the draft Bud Report for FY 2014-15 and advised that she sent same version to Coleman.  She asked how to handle the deficit and reaffirmed she was "very uncomfortable with the direction of our entire budget process and I can feel the pressure at ABC to remain silent.  I must trust you and the cabinet members are acting in the best interest of the University.  However, I did not anticipate being in a position of constantly plugging numbers without specifics which constantly jeopardizes my integrity and reputation."  A true and correct copy of Ms. Bradley's email to Mixner and Coleman and draft Bud Report referenced in this paragraph is attached as Exhibit 36.

100.    On September 20, 2013, Mixner replied to Ms. Bradley's email in part "[t]hanks for hanging in there.  If FY 14-15 must be balance [sic] for this report, I suggest that you use carry-forward of funds.  Obviously that strategy is not something that can be continued in perpetuity, but it should be adequate for the Bud Report."  A true and correct copy of Mixner's September 20, 2013 reply email to Ms. Bradley referenced in this paragraph is attached as Exhibit 37.

101.    On September 24, 2013, Ms. Bradley emailed Mixner questioning whether the President approved an additional $3.2 million for discretionary and contingency funding. She

then stated that if they were increasing the budget, they would need to update the November COT report to so reflect.

102.    Mixner confirmed that the President approved the additional $3.2 million.  He added that "[a]t this point, I don't see us updating the resolution and maybe not even the budget. However, we will want to inform the COT of the change. I plan to begin laying the groundwork with the COT this Thurs."  A true and correct copy of Ms. Bradley's and Mixner's September 24, 2013 email exchange referenced in this paragraph and the paragraph preceding it is attached as Exhibit 38.

103.    That same day, Ms. Bradley emailed Mixner questioning whether the Strategic Plan had been approved and whether there was a summary of the main objectives that would be incorporated into future requests for funding.  Mixner replied that the plan had been approved, but they did not have funding requirements beyond the first year.  He stated that he needed to reconcile the first year requirements with Dowdy, at which point discussions could take place regarding further funding.

104.    Ms. Bradley also that day expressed concern with $15 million in transfers.

105.    On September 26, 2013, Ms. Bradley sent a detailed email to Mixner, Hinkle and Werley raising questions concerning performance funding, discretionary funds and contingency budget, while noting that the COT budget did not include the $3.2 million and would need to be updated for the next COT meeting.  She asked for input.

106.    Mixner responded to the group, and notably stated that the $3.2 million that was absent from the COT budget was "an issue for further discussion."  A true and correct copy of Ms. Bradley's and Mixner's September 26, 2013 email exchange referenced in this paragraph and the paragraph preceding it is attached as Exhibit 39.

107.    On October 1, 2013, Dr. Lisa Millhous, President of the local APSCUF Union, emailed Mixner a request for the FY 2014-15 PASSHE Budget Report that was sent to the Chancellor's office as they were in discussions locally and at the state level concerning the budgeting process.  Mixner emailed Ms. Bradley and asked her for the final Bud Report.  Ms. Bradley advised Mixner via email that Johnson and Coleman conducted a conference call the prior week in which they advised that past practice had been to not provide entire reports to APSCUF, but rather only to provide a few worksheets.  Mixner responded to Ms. Bradley and questioned what worksheets they were referring to and why were they concerned about providing entire reports.  A true and correct copy of Ms. Bradley's and Mixner's October 1, 2013 email exchange to referenced in this paragraph and the paragraph preceding it is attached as Exhibit 40.

108.    On October 10, 2013, Johnson emailed all PASHEE university Budget Directors advising them that some, if not all, local APSCUF offices were requesting Bud Reports from previous years, including the most recent year.  Similarly, state-wide APSCUF had been asking for the reports from PASSHE.  She noted the past practice, based on "a long-standing agreement," had been to provide State-wide APSCUF current year E&G revenue and expenditure detail by university annually after the October Board meeting.  APSCUF was now specifically asking for the entire Bud Report for each university for several years, which had not been previously provided.  Johnson said that the Bud Reports were going to be provided to APSCUF, except for deleting employee names, but that the current year's Bud Report would not be furnished until after the Board meeting to be held the following week.  She asked the Directors to let her know if they had any concerns.  A true and correct copy of Johnson's October 10, 2013 email referenced in this paragraph is attached as Exhibit 41.

109.   On October 10, 2013, Ms. Bradley emailed Mixner and Hinkle and reiterated her concerns with the budgeting process.   Those concerns included the discrepancies between theoretically actual surplus amounts contained in the Bud Reports versus amounts in WCOT reports. She noted Hinkle's advice the day before that it was an acceptable practice to transfer unrestricted surplus to plant, and thus WCU would not be at risk.   She pointed out her belief that under PASSHE instructions, carry forward rollover balances needed to be supported with specific details and the balance should remain in the reserves in E&G, and not transferred to plant.   Given her understanding that WCU was in a process of right sizing budgets, it would be eliminating the need for rollovers. The current rollover balance was $17.5 million, and she was perplexed that they would have to take from reserves to cover "shortfalls" in the anticipated budget when such large rollovers existed.   She had expressed her opinion at the ABC meeting that rollover balances should be supported.   She also stated that she and her ABC colleagues should understand the components of cash position by unrestricted (liquid uncommitted) vs. committed (plant projects), restricted and auxiliary. She had no idea how much liquid cash was available for future endeavors.   She attached a newspaper article concerning a recent Finance Meeting in Radnor whereby school officials had come under community scrutiny regarding hidden surplus mirroring the hidden surplus issues at WCU.   She noted that after reading that article, she hoped Mixner and Hinkle could empathize with her concerns. She reiterated her discomfort with reporting to PASSHE and the WCOT due to the lack of transparency, communication and planning.   She expressed concern about damage to her reputation and career, which she worked very hard to build.   She asked for reassurance that her reputation, integrity and career would be protected if the topic came under public scrutiny and for Mixner and Hinkle to "affirm our current practices are appropriate."   A true and correct copy of Ms. Bradley's October 10, 2013 email to Mixner and Hinkle referenced in this paragraph is attached as Exhibit 42.

110.    Mixner responded by email on October 13, 2013.  He noted that they were in a pretty significant transition in the budgeting process and that Ms. Bradley had certainly helped with that and her leadership would be important to their future success.  He expressed confidence that with a little time they would have a vastly improved process from what they had just two years before.  On the cash issue, he noted that he and Hinkle had been discussing how best to determine available funds and likely commitments against those funds for the next five years.  He then stated '[i]n regard to the assurances you seek, I can tell you that I accept responsibility for my actions and I do not use others as scapegoats.  What I cannot tell you is that your position – or mine – is risk free.  In my more than 25 years in public higher education, I have come to understand that most administrative positions carry a fair amount of risk, and the higher the position in the organization, the greater that risk generally is.  Ultimately, each of us has to determine if that risk is acceptable."  His parting advice was "[i]f you would like to discuss further, I suggest we do so in person."  A true and correct copy of Mixner's October 13, 2013 reply email to Ms. Bradley referenced in this paragraph is attached as Exhibit 43.

111.    On October 16, 2013, Ms. Bradley submitted to Mixner draft WCOT materials she prepared that showed the carry forward amount at $7.7 million.  A true and correct copy of Ms. Bradley's October 16, 2013 email to Mixner referenced in this paragraph is attached as Exhibit 44.

112.    On October 17, 2013, Mixner responded stating he had given considerable thought to the carry forward issue and had decided that he believed they needed to stay with the $4.5 million that they showed in the original budget.  He reasoned that they should be showing what they believed would occur, and he believed it unlikely the $7.7 million would be spent.   He informed Ms. Bradley that he would make the changes on the WCOT material so that Ms. Bradley would "have a strong guarantee of protection if my judgment is incorrect."

113.    Mixner followed-up with an email that noted that on the budget approved by the WCOT the month before, they showed Facilities Improvements under Expenditures, but did not show the carry-forward amount under Expenditures. He asked Ms. Bradley to make those adjustments for the November report, but with the $4.5 million carry forward. True and correct copies of Mixner's October 17, 2013 reply emails to Ms. Bradley referenced in this paragraph are attached as Exhibit 45.

114.    On October 18, 2013, Ms. Bradley responded to Mixner reiterating her view that in her opinion the budget should equal the amount available for spending, and that she thought transparency was a goal they were mutually supporting. She pointed out that the WCOT presentation did not show WCU's available expense budget and consequently an external party would not be able to decipher what the actual results would be if the projected expense budget was expended. She also noted that if she understood his position correctly, Mixner was hedging that available budget would not be spent, therefore there was no need to update the WCOT report. Subject to her concerns, Ms. Bradley complied with Mixner's instruction to decrease the Carry Forward Balance from her $7.7 million to Mixner's $4.5 million.

115.    Mixner responded that it was possible that his email was not as clear as he intended. He was not asking Ms. Bradley to validate his decision to go with the $4.5 million. He noted that he was "willing to make that decision and stand by it, regardless of the outcome." A true and correct copy of Ms. Bradley's and Mixner's October 18, 2013 email exchange referenced in this paragraph and the paragraph preceding it is attached as Exhibit 46.

116.    On October 23, 2013, Coleman emailed all Budget Directors to notify them that APSCUF had recently requested Bud Report and Interim Bud Report information for the preceding five years. A link on a sharepoint page to information provided was given to all Budget Directors so all could remain on the same page if questions arose. A true and correct

copy of Coleman's October 23, 2013 email to all Budget Directors referenced in this paragraph is attached as Exhibit 47.

117.    On November 22, 2013, Mixner emailed Ms. Bradley stating that normally she would have been involved in discussion and development of budget information presented the day before at a President's Council meeting with respect to WCU's state-related status, however, the President confided in very few people and directed that state-related status and documentation created to support such a transition remain confidential.  And even though the President had then broached the topic publicly, he had further directed that documentation remain confidential.

118.    Ms. Bradley replied that Mixner's projections were misleading, and were contradicting reality.  She pointed-out that Mixner's projections were based on a budget that excluded rollovers, and ignored actual surpluses that had been in the $11 - $17 million range over the last several years.  She also noted that Mixner's deficit likely created the shock value for state-related purposes that was possibly intended. She noted her surprise that Mixner's 5-year projected budget was not vetted at the ABC meeting prior to its being shared at President's Council.  Ms. Bradley questioned why the state-related scenario had been shared with her ABC colleagues, including Hinkle, while she was not given information that would allow her to bring value or to be an informed contributor.  A true and correct copy of Ms. Bradley's and Mixner's November 22, 2013 email exchange referenced in this paragraph and the paragraph preceding it is attached as Exhibit 48.

119.    On January 31, 2014, Ms. Bradley and Hinkle arrived at a scheduled meeting of the Finance and Budget Committee of the WCOT, which was cancelled shortly before the scheduled meeting time so the WCOT could meet privately to discuss the transition to state-

related status.  Hinkle asked Mixner if the WCOT members would be discussing the state-related topic, and Mixner said no, that the meeting would be a waste of their time.

120.    Shortly after the introduction of the Secession Bill on March 12, 2014, as reported by the *Pittsburgh Post Gazette*, Chancellor Brogan said buying back campus land and buildings as required by the legislation would be a major obstacle, and that taxpayers might object to such use of public funds.  Chancellor Brogan stated to the effect, "They believe that money is being used to provide them the professors, the support staff, the opportunity today to better their educational experience.  They sure don't believe it's going to be squirreled away in part by those institutions [to] buy their way to quasi-private status."  (emphasis supplied).

121.     On March 13, 2014, a President's Council meeting was held to discuss the Secession Bill and other upcoming public meetings to take place that day to discuss it.  A true and correct copy of the Secession Bill is attached as Exhibit 49.

122.    After the meeting, Ms. Bradley emailed Mixner with concerns about conflicting budget messages being put out by the President.   She noted at the November 21, 2013 President's Council meeting, a five-year budget was presented that projected deficits of $6.9, $15.1, $24.3, $34.8 and $41.4 million for the years ending 2014-15, 2015-16, 2016-17, 2017-18 and 2018-19, respectively.   The deficits were purportedly based on the assumptions that appropriations would remain flat, enrollment would grow each year by 300, salaries would be based on collectively bargained terms and carry forwards would remain at $4.5 million.  Based on the large surpluses WCU had realized in the past few years, Ms. Bradley questioned why WCU would incur such huge deficits.  She had requested copies of the budget and support, but her request was denied purportedly because of confidentiality concerns.

123.    Ms. Bradley noted further in that email that at the President's Council meeting the preceding week, the President addressed a news article concerning WCU transitioning to state-

related status, which had indicated the transition would result in significant tuition increases. The President refuted those concerns stating WCU was financially strong.  Ms. Bradley noted that that statement contradicted what was presented at the November 21 meeting.  She expressed concerns about the credibility of what was being communicated by the President and state senators.  Ms. Bradley added that the President mentioned at the meeting that day that a pro forma demonstrated that WCU would not have to increase tuitions by more than $550.  To alleviate her concern, she asked Mixner to share his pro forma.  A true and correct copy of Ms. Bradley's March 13, 2013 email to Mixner referenced in this paragraph and the paragraph preceding it is attached as Exhibit 50.

124.    Mixner shared his pro forma with Ms. Bradley and mentioned that "[b]efore you lose too much sleep over the possibility of WCU going state-related, let's see if the bill gets any traction.  As you heard this morning, the Governor has voiced his opposition."

125.    Mixner followed up with another email stating that until a feasibility study was conducted, it would be difficult to know how accurate the projections were since many of the assumptions had not been verified.  He preferred to have the results of the feasibility study "before we charged forward…."  True and correct copies of the March 13, 2013 emails and pro forma referenced in this paragraph and the paragraph preceding it are attached as Exhibit 51.

126.    On March 19, 2014, in working on the Interim Budget Report, and before sending it to Coleman, Ms. Bradley asked Mixner if he still wanted her to maintain the $4.5 million Carry-Forward in the FY 2014-15 budget given that they increased the operating base budget and she anticipated having approximately $9-10 million unexpended balances in FY 2014.  Mixner replied that he could not access a computer to view the spreadsheet until the following day, and asked Ms. Bradley for her recommendation in the meantime.  Ms. Bradley's March 19, 2013 email and the Interim Budget Report referenced in this Paragraph are attached as Exhibit 52.

127.    Ms. Bradley responded that she was not in a position to make a recommendation and would need to rely on Mixner given WCU's current cumbersome and loose accountability model.  She laid out a model under which she could make a recommendation and noted that she had continually strived to implement a new budget process but had not received support from a majority of ABC members.

128.    On March 21, 2014, Ms. Bradley emailed Mixner to confirm his instructions to insert the $4.5 million Carry-Forward on the Interim Bud Report.  Ms. Bradley reiterated that in good conscience she could not force a deficit when WCU had yielded during her tenure such large unrestricted surpluses.  A true and correct copy of Ms. Bradley's March 21, 2013 email to Mixner referenced in this paragraph is attached as Exhibit 53.

129.    Mixner advised Ms. Bradley to proceed with submitting the Interim Bud Report as he had instructed.  He also asked her to outline the steps needed to transition to her proposed model.  He stated that he wanted to try to get advance consensus from Linda Lamwers, an ABC member, and Dowdy, on key issues so they would have support at ABC.

130.    On April 2, 2014, Ms. Bradley emailed Coleman with her responses to questions Coleman had raised about the Interim Budget Report.   On item 11, Coleman had noted non-mandatory transfers had been decreased $6.6 million, and questioned whether that was done to balance the budget.  Ms. Bradley responded that the "balance was decreased because I don't agree that I have to create a deficit to influence economic decisions."  A true and correct copy of Ms. Bradley's April 2, 2013 email to Coleman referenced in this paragraph is attached as Exhibit 54.

131.    On April 3, 2014, WCU's chief human resources officer Maloy sent Ms. Bradley an email that was highly critical of WCU's senior leadership.  In that email, Maloy wrote as follows:

"Bicking is dumber than I thought he was.  Seriously, I think it was helpful that Mark [Mixner] was able to see that my, your and Bernadette's concerns are not isolated, but shared by many employees in the division.  I think it was also helpful that division employees got a few glimpses of candor from Mark, and were able to hear bits of what Mark really thinks or believes.  I think maybe it will also help him also make the connection a little more clearly that there can be a legitimate distinction between supporting the President's interests and supporting the University's or the public's interests.  On state-relatedness, the interests are clearly polarized.  Supporting the President is supporting the screwing of the public, the students, PASSHE and our employees.  It might also reinforce for him that employees have pretty good bullshit detectors, too.  They typically know crap when it is shot at them.  Facts and integrity breed trust.  A public relations grease job breeds suspicion and distrust.  Maybe it helped some employees also see that arrogance and ignorance can sometimes be mistaken for wisdom and intelligence.  I remain convinced that more autonomy to the Greg Weisensteins, Mark Pavlovich's and Dirty Rich's of the world means the ability to do whatever you want to whenever you want, whether you know what you are doing or not, without culpability for the consequences.  That's really there [sic] negotiating list for PASSHE.  Perhaps maybe Mark will also risk carrying back to Cabinet the realization that employees are smart enough to know that paying the fox to do a study on the security of the chicken coop is probably not the best way to protect the chickens, but is the best way of ensuring the fox remains well fed."

A true and correct copy of Maloy's April 3, 2014 email to Ms. Bradley is attached as Exhibit 55.

132.    On May 3, 2014, Ms. Bradley emailed Johnson and Coleman and expressed appreciation for a meeting of the Budget Directors of the fourteen PASSHE universities at which Johnson and Coleman discussed tightening up budgeting and accounting practices.  Ms. Bradley shared the following in that email:  "The content was hopeful in regards to increasing financial transparency.  I have found the accounting and financial reporting very loose and not informative and I am excited to think the overall System will be implementing reporting that will force improved accounting and meaningful reporting….Look at the Budget reported on the COT vs the Budget that is in SAP and the Bud Report budget.  The differences will highlight how even within our own University how very different the budget is depending on what information the user is looking at.  The budget available to each division and reflected in SAP is supported by reserves in the plant fund."   A true and correct copy of Ms. Bradley's May 3, 2013 email to Johnson and Coleman referenced in this paragraph is attached as Exhibit 56.

133.   On May 31, 2014, Ms. Bradley received an "A" grade in a Non-Profit Government Accounting course at WCU.

134.   In June, 2014, Ms. Bradley submitted her Status Report on her 2013-2014 performance objectives.  The substance of this Report that follows was later validated by Mixner in his September written evaluation of Ms. Bradley's performance:

**"Initial Goals:**

Critical Implementation of SAP Position Budget Management (PBM) system including data validation with Human Resources, system enhancement with PASSHE PBM team and collaboration with CMS/PeopleSoft Task Force.  The new system will be the source of the Education and General Budget and the auxiliary budget.  **Status: Accomplished**

Maintained two Systems (CMS and PBM) for personnel.  **Status: Accomplished**

Refine budget via phase 1 of right-sizing of Operating Budgets.  **Status: Accomplished**

Provide a graphical outline and a recommendation to ABC to develop the budget and enhance the process.  **Status: Accomplished**

Developed various tools and templates as needed for the administrative budget committee.  **Status: Accomplished**

Streamlined auxiliary process to be more efficient and effective.  Developed capability to perform variance analysis at a lower granular level by working with PASSHE members at the 6 digit commitment level verses 3 digit roll-up level.  **Status: Accomplished**

Initiated meetings with business managers throughout the year to share reporting enhancements and exchange needs and budget information.  **Status: Accomplished**

Provided support to the Self-support committee **(Assessment and Recommendation in Progress)**

**Additional Initiatives:**
Provided suggestions to PASSHE representatives on ways to improve the budget report.  **Status: Accomplished**

Catalyst to change Institutional Research Enrollment Projection Model.  **Status: Accomplished**

Catalyst to fix accounting for chargeback expenses.  **Status: Accomplished**

Developed a more transparent Council of Trustee report and an improved narrative to accommodate the financial report. **Status: Accomplished**

Provided recommendations to senior management in relation to strategic sustainability goals to position the University to effectively use its financial resources **(outstanding)**

Implemented new GA cost center/accounting process to better analyze the financial aspects of Graduate Assistantships at WCU. **Status: Accomplished"**

A true and correct copy of Ms. Bradley's Performance Objective Status Report is attached as Exhibit 57.

135.   On June 6, 2014, Mixner emailed his staff on how to rate employees under WCU's new Performance Management Instrument for formal employee evaluations. The new form had five rating levels, 1-5. He focused in on level 3 being labeled "effective" and defined as "Outcomes/performance consistently met expectations in all key areas of responsibility, and at times, exceeded expectations. Overall quality of work is good or very good. The most critical annual goals were achieved." He went on to express his view that "Level # 3 is where I expect most high-performing managers will be rated on their individual objectives. A level #4 rating certainly is possible for individual objectives, but this rating would be unusual. A level #5 rating would be even less likely…." (emphasis supplied). A true and correct copy of Mixner's June 6, 2014 email to staff referenced in this paragraph is attached as Exhibit 58.

136.   Ms. Bradley replied to Mixner's email stating that she supported a different approach to evaluating her employees. Based on WCU's demands, she had to encourage employees to give 100% and work beyond their job classifications, some of whom deserved to be reclassified. She said she would work on paperwork to support reclassifications, but in the meantime she encouraged evaluations if warranted to reward performance via using the appropriate level while increasing morale. The merit increase would temporarily adjust the equity portion of their pay.

41

137.   On June 27, 2014, Hinkle emailed Annette Mathes, PASSHE Controller, and asked about rules for interfund transfers.  She pointed out that it had been WCU's practice to "transfer year-end E&G surpluses to Plant.  Over time, we have designated the funds as university reserves and plant projects."  She then questioned whether there was "any prohibition that if we need funding for current year operations that we could transfer from Plant to E&G?"  She then mentioned that this year's budget allocations and next are bigger than actual revenues.

138.   Mathis replied that there "is nothing to prohibit you from transferring from Unrestricted Plant back to E&G.  There are no 'rules' or guidelines in place with regard to these transfers."  A true and correct copy of Hinkle and Mathis' June 27, 2014 email exchange referenced in this paragraph and the paragraph preceding it is attached as Exhibit 59.

139.   Hinkle then emailed Mixner, Vermeulen, Dowdy, Ms. Bradley, Fiorentino, Pavlovich, Werley Bricketto and McCadden to provide them all with "assurance that if warranted, the University can spend Unrestricted Plant Funds for E&G operations," and she shared with them Mathis' response.  She noted, among other things, that PASSHE "calculates we have $97,778,943 in E&G Unrestricted Net Assets, which includes what's in Plant and E&G. It's all considered Unrestricted and presented in total.  If the University's operating budget exceeds its revenue (as Ms. Bradley displayed yesterday), we would have approximately $17 million in E&G Operating to spend or we can transfer moneys back into E&G operating from Plant."  A true and correct copy of Hinkle's June 27, 2014 email to staff referenced in this paragraph is attached as Exhibit 60.

140.   On June 27, 2014, Ms. Bradley forwarded the Hinkle and Mathis correspondence to Johnson and Coleman, designated the email "High Importance" and noted that at BAD meetings and at a previous meeting with them, it had been expressed that funds could not be transferred from plant into E&G.  She then explained that in her work on the FY 15 budget,

approximately $7.7 million of the requests would be supported by carry forward dollars located in Plant or would reduce reserves in E&G.  She then noted that if WCU continued to develop a budget that exceeds sources, she had requested that year-end surplus not be transferred to plant so that it would be available to fund the carry forward requests.  She asked them to confirm Mathis' advice.  A true and correct copy of Ms. Bradley's June 27, 2014 email to Johnson and Coleman referenced in this paragraph is attached as Exhibit 61.

141.    Having received no response to her June 27 email, Ms. Bradley emailed Johnson and Coleman again on July 1, 2014, designating the email "High Importance" and reiterating her request for confirmation of Mathis' advice.  A true and correct copy of Ms. Bradley's July 1, 2014 email to Johnson and Coleman referenced in this paragraph is attached as Exhibit 62.

142.    On July 30, 2014, Mixner authorized Ms. Bradley to incur $1500 in expenses to attend the NACUBO Planning and Budgeting conference in Denver, CO in September, 2014.

143.    On August 10, 2014, Ms. Bradley sent High Importance email to Mixner, Hinkle and McCadden in which she summarized the current snapshot of WCU's year-end performance that she projected based upon data then in the Fin Report and within SAP.  The numbers were not final due to a few entries that remained to be posted.  She noted that the incremental roll balances increased materially because WCU provided budget that technically was supported in $7.7 million of carry forward balances or reserves.  This incremental increase was to the detriment of increasing one-time fund balances, a practice she did not support.  While the roll balance was not final due to settling up of personnel entries, to complete the Fin Report, a total of $11.2 million would be transferred to plant and $1.1 million would remain in E&G unrestricted net assets.  She also noted that once ABC approved the fund centers and balances exempt from tax, the Budget Office would adjust the operating and personnel rollover balances accordingly and transfer the residual balances to the unrestricted fund in plant or transfer-in to

E&G per Mixner's/ABC's direction.  A true and correct copy of Ms. Bradley's August 10, 2014 email referenced in this paragraph is attached as Exhibit 63.

144.    On August 12, 2014, Ms. Bradley forwarded an email to Mixner that demonstrated that the budget model was still in flux, and because she needed to begin working on the Bud Report and WCOT upcoming meeting, she asked Mixner if she could ask the campus to provide their best estimates for FY 14-15 by August 19.  She expressed frustration with numbers being changed without communication to her office and she needed him to support her in ensuring his reports were keeping her informed.  Non-compliance by Mixner's personnel with her information requests was compromising her ability to do a thorough job and placing her in the challenging position of not knowing when she should act proactively as a Director vs, a budget clerk, reacting to directives or abrupt communications.

145.    On August 13, 2014, Ms. Bradley sent a third "High Importance" email to Johnson and Coleman, this time copying Hellmig, Kettlety, Mount and Westervelt.  In it she stated "I am assuming no response is a given that balances can be transferred from the unrestricted plant fund reserves to the education and general fund when the surplus in the education and general funds is less than the funds available due to departments owning rollover balances."  She asked for clear confirmation that it was an acceptable practice.  She asked them to call her if they did not understand her question.

146.    Johnson emailed a detailed response and first apologized for her delayed response to Ms. Bradley's requests.  She confirmed that Mathis was correct that there were no accounting rules that would prohibit a transfer from Unrestricted Plant back to E&G.  She warned, however, that "as a management practice it is highly discouraged."  She continued as follows:

"When funds are transferred from E&G to Unrestricted Plant, it is the university's expressed intent that those funds will be used for Plant purposes and will no longer be need [sic] for E&G purposes.  The intent is expressed publicly, based on the financial

performance and the Plant needs of the university.  Those transfers are typically for the renewal and replacement of existing facilities or to share in the cost of new facilities, as well as capital equipment.   Typically the funds are designated for certain specific projects.  These funding requirements are part of the long term strategy for the physical health of the university.  On limited occasions, it may be appropriate to transfer funds back to E&G, such as: 1) if the university receives another source of funds (e.g., a grant or state capital funds) for a particular project that was originally to be funded from the plant fund; or 2) if the E&G budget challenges warrant a **change in priorities** in the use of those funds (e.g., revenue reductions result in the university foregoing plans for a building renovation).   In other words, the university should be very judicious in transferring funds between E&G and Plant, as it represents the university's strategic commitments for the future uses of its funds."

147.    Johnson continued as follows:

"I am a bit surprised/confused by your comment about the impact of department rollover balances on availability of E&G funds**.**  Unless those rollover [sic] were earmarked for a major capital equipment purchase or to help pay for a new academic facility in which the department will be housed, I would expect those rollover funds to always be in the E&G fund and never be transferred to Plant.  Again, it is all about the intended use of those funds."

A true and correct copy of the email exchange between Johnson and Ms. Bradley referenced in the preceding paragraphs is attached as Exhibit 64.

148.    Ms. Bradley replied on August 13, 2014 by stating that they had had several conversations about the rollover balances/intended use. She expressed that Johnson could simply look in SAP and see that carry forward balances in departments had been supported with reserves in plant.  She added that the topic was addressed in November 2013 when Johnson and Coleman met at WCU with Ms. Bradley's team.  Ms. Bradley then questioned whether Johnson was implying that she was receiving new information.  A true and correct copy of Ms. Bradley's August 13, 2014 reply email to Johnson and Coleman referenced in this paragraph is attached as Exhibit 65.

149.    On August 14, 2014, Ms. Bradley received a 4.1% salary increase.

150.    On August 15, 2014, a President's retreat was held in the Phillips Autograph Library.  At the retreat, Mark Pavlovich explained that the Secession Bill had a long history prior

to its introduction.  He said the WCOT had been discussing the Secession Bill for years given the challenges PASSHE had experienced.

151.    On August 16, 2014, Johnson replied to Ms. Bradley's August 13 email stating that "[c]ertainly it is appropriate to have 'roller [sic] over accounts' for academic departments.  I am just surprised they would be housed in the plant fund.  Please feel free to call me Monday if you have further questions."  A true and correct copy of Johnson's August 16, 2014 email to Ms. Bradley referenced in this paragraph is attached as Exhibit 66.

152.    On August 21, 2014, Hinkle sent a detailed email to Mixner on which she copied Ms. Bradley and in which she expressly validated the significant concerns Ms. Bradley had been raising since early in her tenure.  She understood Ms. Bradley's apprehension and characterized the situation as a "predicament."  She characterized as the "root issue" the question of "how to characterize the departmental rollover balances on the BudRPT." In this respect, she confirmed "[a]s you know, I am uneasy and uncomfortable how this has been handled as well." She noted that the same issue applied to the PASSHE Fin Report, for which she was responsible. In the SAP financial accounting system, the rollovers had been included in the departmental base budgets, but they were not so reflected in the PASSHE Bud Report or the budget approved by the WCOT.  In the Fin Report, the departmental rollovers were shifted to the Plant Fund.  She stated that "on the FinRpt's Unrestricted Net Assets page, the dollar amounts are changed to reflect the use of these funds for 'future' construction projects.  As I understand, the designations are based upon the campus master plan and the need to identify for PASSHE the purposes of the available resources."  She recognized that Ms. Bradley did not feel comfortable with loading the rollovers in E&G cost centers but not reflecting the data on the Bud Report and COT budget. Hinkle acknowledged, "I agree with [Bradley] that if questioned, she would be in a difficult position to explain why the University has allowed campus to spend through rollover dollars

more than what the BOG/COT has approved every year.  Professionally speaking, it does seem that the University is not transparent with regards to the rollovers through the reporting of the BudRpt and FinRpt."   Hinkle acknowledged that that with millions of dollars incrementally rolling every year, this indicated that the base budgets were not spent year after year.  Hinkle proposed a solution that she believed would discontinue the practice and "assist the reporting of the rollover funds to the true intent." (emphasis supplied).  A true and correct copy of Hinkle's August 21, 2014 email to Mixner referenced in this paragraph is attached as Exhibit 67.

153.   On August 21, 2014, Ms. Bradley emailed Mixner a document that contained PASSHE's comments to that year's draft Bud Report.  One of the comments pertained to carry over balances.  PASSHE noted that in past years, the line for planned use of the carry over funds line had been used to balance the prior year budget in the Bud Report. PASSHE's comment provided "[t]his practice will no longer continue.  The only amount to be shown in this line is funds used for specific, planned one-time purposes and have a corresponding expenditure to show how the funds were used."

154.   In her email, Ms. Bradley stated that she had expressed in the morning that the budget loaded in the accounting system and made available to the divisions even though supported with funds in Plant should equal the budget on COT and PASSHE budget reports.  She confirmed that Mixner had stated that even though the budget was owned by the divisions, the likelihood of the budgets being spent was low.  Ms. Bradley questioned Mixner that if they did not plan to actually use carry forward, but the budget was available and loaded in SAP, were they expected to report budget available or budget actually intended to be spent.  She said she needed clarification from Lois and Ginger.

155.   Mixner replied "[w]e need to have further internal discussions before we seek guidance from PASSHE.  However, I've always viewed a budget as the financial plan.  I struggle

with the idea of presenting a financial plan that we strongly believe – based on our experience – is not reflective of what is likely to occur.  Having said that, I understand the dilemma."  A true and correct copy of the email exchange between Ms. Bradley and Mixner, together with the draft Bud Report and final Bud Report is attached as Exhibit 68.

156.    On September 9, 2014, Ms. Bradley received notice that she received an A- in an auditing course she took over the summer on a pass-fail basis to help prepare for the CPA exam.

157.    On September 23, 2014, Ms. Bradley attended the NABUCO conference in Denver, Colorado at WCU's expense with Mixner's prior approval.

158.    At the regular meeting of the WCOT held on September 25, 2014, Dr. Lisa Millhous, President of the local APSCUF Union, addressed the WCOT.  Her address included the following request:  "After last year's stressful conversations about a possibly dismal financial future, it concerns us that the university budget is shrouded in mystery.  I would ask the administration and the Trustees to be more transparent about the financial picture and engage us in public conversation as the unknowns continue to unfold…. We need to focus on our core function of educating students and build a strong future with greater transparency."  A true and correct copy of the minutes of the September 25, 2014 referenced in this paragraph is attached as Exhibit 69.

159.    On September 26, 2014, Mixner delivered to Ms. Bradley her written performance evaluation.  WCU had transitioned to a new rating system, a 1-5 system.  A 3 was Effective, a 4 was Highly Effective and a 5 was Exemplary.  Mixner rated Ms. Bradley 3s, a "high performer" rating by his standards, in Leadership, Commitment to Mission, Vision & Values, Relational Skills and Communication Skills.  He rated her a 4 in Resource Management and Business Processes and Technology, a rating that he had expressed was reserved for a select, exceptionally high-performing, few.  A true and correct copy of the Mixner September 26, 2014

email to Ms. Bradley as well as Ms. Bradley's written performance evaluation referenced in this paragraph are attached as Exhibit 70.

160.    In the Performance Objective Results section of the Performance Evaluation, 5 objectives had been identified, one of which had been eliminated. With respect to the remaining four objectives, Mixner rated Ms. Bradley a 4, Highly Effective.  These objectives included Implementing a major Performance Budget Management System, integrating the enrollment model with the revenue model, and developing a process for ABC to entertain requests for supplemental funding.

161.    Mixner also acknowledged Ms. Bradley's perseverance in a very arduous process of bringing up the Performance Budget Management System, and Mixner noted that had the System been fully implemented Ms. Bradley's performance would "highly likely" have been a 5. He again referenced her perseverance in being instrumental in developing a much improved enrollment projection model.  With respect to her efforts with ABC, Mixner noted that despite significant challenges and changes of direction from ABC, "Ms. Bradley continued to develop and refine processes to meet the needs of ABC and the University." Mixner also noted that "[o]ver the next year, several of the investments you have made (e.g., PBM) should come to fruition." (emphasis added).

162.    A September 28, 2014 article in the *Pittsburgh Post-Gazette* reported:  "In June the Pittsburgh Post-Gazette, citing campus emails obtained under the state's Right-to-Know Law, reported that top West Chester leaders engaged in what amounted to a stealth campaign to promote introduction and passage of Senate Bill 1275, the controversial secession legislation that the system leadership opposed.  Mr. Brogan said he has contacted West Chester officials about the matter. "I was told that it was not the administration at West Chester. It was the supporters of West Chester," Mr. Brogan said. Asked if he believed that explanation, the Chancellor replied:

"Not for a minute. I think it's an inappropriate use of time," he said, referring to the apparent behind-the-scenes actions of campus officials to quietly promote the bill, which did not advance. "I have reiterated that in my opinion as a chief executive officer who works with a board that if you have a problem with the system it is better to transparently address [it]." (emphasis supplied). A true and correct copy of the September 18, 2014 article published in the *Pittsburgh Post-Gazette* is attached as Exhibit 71.

163. On October 6, 2014, a President Cabinet Meeting was held during which there was a discussion concerning a request by campus Opinion Leaders, known in the inner circle as the "difficult group," for detailed financial projections. The meeting was scheduled for October 30, 2014, with the objective of better engaging stakeholders in the budget process.

164. During their weekly meeting held on October 8, 2014, Mixner asked Ms. Bradley to prepare projections for the October 30, 2014 meeting.

165. During the week of October 16, 2014, Mixner informed Ms. Bradley she would present her three-year budget at the Opinion Leaders Meeting scheduled for October 30, 2014. In response, Ms. Bradley asked Mixner if she could present the real budget in addition to the manipulated one; she stated that "I am only comfortable presenting the real budget, too." Mixner agreed to permit Ms. Bradley to present the actual budget.

166. On October 28, 2014, Ms. Bradley emailed Mixner both budget models. At approximately 4:28 pm, Mixner replied with an email informing Ms. Bradley that she could not present the second budgetary model, with the instruction "let's use the non-discounted scenarios." Ms. Bradley wanted to present the "Reality Budget." Ms. Bradley was very concerned with the continued misrepresentation and further perpetuating the misuse of taxpayer funds. A true and correct copy of the October 28, 2014 email exchange between Mixner and Ms. Bradley as well as the two budget models referenced in this paragraph are attached as Exhibit 72.

167.    On October 29, 2014, Ms. Bradley attended a meeting of the Enrollment Management Committee.  Ms. Bradley used the audience to show the manipulated nature of the budget.  She believed this to be an opportunity to inform the group of leaders of the manipulative acquisition and use of taxpayer funds.  Mixner was angered.

168.    On October 30, 2014, the University Leaders Budget Update Meeting was held in the Sykes Student Union Building, Room 10-A, from 2:30-4:00 pm.  The session was a public meeting with an audience of more than thirty people. President Weisenstein made remarks referring to PASSHE's failure.  Mixner then delivered the budget address, showing the budget with hidden transfers.  According to the published agenda, Mixner and Ms. Bradley were listed as providing 2014-2015 Budget Overview and Projections. Ms. Bradley stayed in the audience.  At conclusion of the Budget Projections, a "Roundtable Discussion" was held.  A true and correct copy of the University Leaders meeting materials is attached as Exhibit 73.

169.    During the Roundtable Discussion, Ms. Bradley sat anonymously at a group break out and was unnoticed because she did not make a presentation.  She overheared comments from stakeholders, including the head football coach, Bill Zwaan, who noted that the budget numbers were contrived and that WCU is masking a large multimillion dollar profit.  Coach Zwaan stated that he had no confidence in the WCU leadership.

170.    The President asked each table to provide feedback and Coach Zwaan stood up and said he had been attending budget meetings for the past 3 years and all three years the projection showed huge deficits; and yet, this past year he knew the University made $10.1 million dollars.  He stated that the system and management had no credibility.  The President explained the surplus was attributed to Mixner's outstanding ability to manage costs.

171.    Following the meeting, the President approached Ms. Bradley and asked her opinion of opening up the ABC meetings to select members of the campus community.  Ms.

Bradley stated she was concerned about the dysfunction of the ABC and how it could be embarrassing because based on her experience the meetings were very unorganized and lacked focus. The President responded that he thought attendance by University Leaders might bring focus to the meetings.  Ms. Bradley was pleased by that response. On November 3, 2014, Ms. Bradley sent the President a 12-month calendar of tasks to keep ABC focused.  She hoped he would follow up with her, but he never did.

172.    On November 4, 2014, Ms. Bradley met with Mixner at her scheduled weekly meeting.

173.    At that time, Ms. Bradley was distraught, under duress, depressed, anxious and dismayed that while many leaders inside WCU privately shared her views about the willful distortion and deceitful financial representations being made by WCU to wrongfully acquire taxpayer funding, none of those leaders, including those in the Enrollment Management Committee to whom she had recently clearly expressed the fraud on taxpayers that was taking place, had been willing to step forward publicly to support her actions to actively rectify those malicious behaviors, likely, she believed, because of their fear that WCU and its leaders in the inner circle, or the "money power people" as Maloy characterized them, would retaliate.  Those fears, Ms. Bradley would soon learn, were valid.  The only campus leader that called out leadership publicly on its false budgets was a football coach who was convinced something was wrong, but lacked the information necessary to articulate it.  And he was quickly shut down by the President publicly, who falsely attributed the actual surpluses to the outstanding performance of Mixner in controlling costs.

174.    Ms. Bradley also believed that several of those money power people were playing for time as their retirements were approaching.  Dowdy retired at the end of 2014.  Linda Lamwers, WCU's Provost, was scheduled to retire in 2015.  Dr. Adel Barimeni, Vice President

for Information Services, and member of the ABC, would retire in February, 2015. Mixner was expected to retire in 2016.

175.    Support from Fiorentino, who had been very supportive of Ms. Bradley's transparency efforts early on, had significantly waned after his salary was increased and he was promoted by the President to VP of External Operations in the summer of 2013.

176.    Ms. Bradley believed that PASSHE was moving in the right direction attributable in some part to her efforts that had shined light on the fraudulent transfer to plant scheme beginning in 2012.    She attributed most of the shift, however, to the increasingly heightened light of scrutiny being brought upon it by APSCUF and its requests for full Bud Reports for current and prior years.  She believed PASSHE, and Johnson in particular, were not acting out of an honest intent to rectify a misbehavior that had recently come to their attention concerning WCU's illicit practice of maintaining surplus funds internally accounted for and available to departments in departmental rollover accounts but hidden as expenditures in the transfer to plant expenditure account on Bud Reports; rather PASHEE and Johnson were involved in a cover up, as evidenced by Johnson's feigned "surprise" in her August 2014 email that this fraudulent practice had been occurring, when this practice had been discussed and questioned by Ms. Bradley with Ms. Johnson and ignored by Ms. Johnson beginning in 2012, explored in detail in a meeting called for that purpose with Johnson and Coleman and Ms. Bradley's Budget department in November 2013, and expressly reiterated by Ms. Bradley in an email to Johnson in May of 2014.

177.    At no time during Ms. Bradley's employment, until the January 2015 meeting, was the Bud Report presented to the WCOT.

178.    It was against this backdrop that the November 4 meeting with Mixner transpired. At that meeting Ms. Bradley reiterated she would not participate in contrived budgets – she

wanted to discuss other options where she could perhaps support the Budget Department but she was unwilling to report contrived budgets. She expressed she was willing to discuss reclassifying her position. She was not receiving appropriate information or cooperation to properly perform her duties. Mixner would shortly thereafter use that meeting as one of the pretexts to terminate Ms. Bradley's position.

179.   On November 18, 2014, Ms. Bradley attended a meeting called by Maloy and Mixner at which she was informed that her employment with WCU would terminate June 30, 2015. In the written communication from Mixner notifying her that her employment would terminate,  contrary to her highly favorable past job performance evaluations, Mixner claimed that while Ms. Bradley's "analytical skills and work ethic were strong," the decision was based on the pretext that the University needed "to seek a different type of leadership." In addition, Mixner claimed that the University allegedly needed a "problem solver" (a skill that Mixner had previously recognized Ms. Bradley as having). Mixner's litany of Ms. Bradley's purported performance deficiencies was a complete fabrication intended to mask the WCU Defendants retaliation against Ms. Bradley's exercise, and eliminate the risk of her future exercise, of her rights under the First Amendment to the U.S. Constitution and under the Pennsylvania Whistleblower Law. A true and correct copy of the November 18, 2014 termination letter referenced in this paragraph is attached as Exhibit 74.

180.   At a meeting of the President's cabinet held on January 12, 2015, it was determined that an outside budget consultant had been identified.

181.   On January 13, 2015, Ms. Bradley was asked to sign Request to Hire paperwork for her successor. Ms. Bradley refused to sign the form. The form did not contain a separation date.

182.   Hinkle received a $10,000 raise in January, 2015.

183.    It was announced in January 2015 that the President received a $24,000 raise retroactive to June 30, 2014.

184.    On January 16, 2015, Mixner met with Ms. Bradley's Budget staff to discuss transition.  Ms. Bradley's position was posted publicly without prior notice to her or her office. Mixner resubmitted to Ms. Bradley for signature another version of the Request to Hire form for her position, this time with a separation date of June 30, 2015.  Ms. Bradley refused to sign the form.

185.    On January 21, 2015, Johnson sent to Ms. Bradley and her counterparts at the other PASHEE universities Ms. Bradley's position opening.

186.    On January 22, 2015, Ms. Bradley was hospitalized with severe pain, diagnosed for the second time during her employment with shingles.  Her health care provider recommended three weeks medical leave.

187.    On January 26, 2015, Dr. Ken Dobbs, a budget consultant, visited WCU.

188.    On January 29, 2015, at a WCOT meeting, the President informed the WCOT that WCU had engaged Dr. Ken Dobbs as a budget consultant stating that "[Dr. Dobbs] brought some excellent skills and knowledge about what other universities are doing to create a more efficient, more transparent and more engaged budget process….This is especially important as we look forward to even tighter times in the next two or three years where dollars will become even more scarce than they are at the present time. As we look forward to distributing even fewer dollars and making even more difficult decisions, it is very important that we share that decision-making process."  Attached as Exhibit 75 is a true and correct copy of the minutes of the January 29, 2015 meeting of the WCOT.

189.    Chris Franklin, Chair of the Budget and Finance Committee of the WCOT, presented to the trustees on behalf of that Committee at the January 29, 2015 meeting.  He asked

that the summary of information provided to the trustees be made part of the record.  He called the trustees attention to "a thick packet" that was sent to the BOG.  Franklin stated that the packet of information he provided was "worth a look" and contained "some interesting numbers," and that "It is eye opening to see the numbers that were sent to the State." Id.

190.    During the three years ended June 30, 2014, 2013, and 2012, WCU's Educational and General Fund unrestricted net assets increased by approximately $56.6 million.  Attached as Exhibit 76 is a true and correct copy of WCU's audited financial statements for the Educational and General Fund for the fiscal years ended June 30, 2014, 2013, and 2012 showing such increase.

191.    On January 29, 2015, Mixner presented the Bud Report to the Budget and Finance Committee of the WCOT. This was the first time the Bud Report had been submitted to members of the WCOT during Ms. Bradley's employment.

## COUNT I

## VIOLATION OF CIVIL RIGHTS

### 42 U.S.C. § 1983

### Deprivation of First Amendment Constitutional Right to Free Speech

192.    Plaintiff incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

193.    The conduct of Defendants named above as described in this Complaint violated Ms. Bradley's rights under the First Amendment to the U.S. Constitution as made actionable against such Defendants pursuant to the Civil Rights Act of 1871, as amended in 42 U.S.C. Section 1983.

194.    Defendants acted under color of state law, and while acting under the color of state law, Defendants deprived, and/or conspired to deprive, Ms. Bradley of a constitutional right.

195.    Defendants deprived Ms. Bradley's free speech by directly or indirectly terminating, or conspiring to terminate, her employment, in retaliation for exercising her free speech within and outside of her employment duties and responsibilities to WCU leaders inside and outside of her chain of command with respect to matters of the highest public importance, *viz.* the misuse, mismanagement and waste of public funds, in which the conspiring Defendants engaged.   Ms. Bradley's exercise of her freedom of speech was a substantial or motivating factor in the retaliatory action.  Given such high public importance, Ms. Bradley is entitled to the highest level of First Amendment Protection.

## PRAYER FOR RELIEF

 **WHEREFORE**, Plaintiff respectfully request that this Court:

1.  Award Plaintiff past and future damages for loss of income, employment opportunities and all other wages and benefits denied to her due to the improper and unlawful actions of Defendants in excess of $150,000.00 excluding interest and costs;

2.  Award Plaintiff damages in compensation for her physical and emotional distress, pain and suffering, mental anguish and humiliation in excess of $150,000.00 excluding interest and costs;

3.  Awards of punitive damages against the respective Defendants;

4.  The award of reasonable attorney's fees, costs of litigation and expenses; and

5.  Any further relief that is warranted.

## COUNT II

## VIOLATION OF THE PENNSYLVANIA WHISTLEBLOWER LAW

196.     Plaintiff incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

197.     The Pennsylvania Whistleblower Law prohibits retaliation against employees of public employers who report instances of wrongdoing or waste to superiors or appropriate authorities.

198.     Plaintiff made numerous good faith reports of wrongdoing and waste, including substantial abuse and misuse of public funds, to her superiors at WCU, WCU management outside the chain of her command, and to PASSHE.

199.     Ms. Bradley's termination was in retaliation for her good faith reports of wrongdoing and waste in violation of the Pennsylvania Whistleblower Law, 43 P.S. §1421, *et seq.* .

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court:

1. Award Plaintiff past and future damages for loss of income, employment opportunities and all other wages and benefits denied to her due to the improper and unlawful actions of Defendants in an amount in excess of $150,000.00, excluding interest and costs;

2. Award Plaintiff damages in compensation for her physical and emotional distress in an amount in excess of $150,000.00 exclusive of interest and costs;

3. Award reasonable attorney's fees, costs of litigation and expenses; and

4. Award any further relief that is warranted.

## COUNT III

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

200.    Plaintiff incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

201.    Through their conduct, including the abuse of their authority and superior positions, to coerce and intimidate Ms. Bradley to not only refrain from disclosing their ongoing pattern of malfeasance, but to repeatedly personally engage in it at the risk of losing her employment for not doing so over a period of three years, and then terminating her employment in retaliation for refusing to engage in unlawful activity and reporting unlawful activity, the Defendants intentionally subjected Ms. Bradley to the physical and emotional stress that she suffered and continues to suffer.

202.    Defendants engaged in outrageous conduct toward Ms. Bradley with the intention to cause, or with reckless disregard or indifference for the probability of causing Ms. Bradley to suffer severe emotional distress.  To the extent such outrageous conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified such conduct with the knowledge that Ms. Bradley's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for or indifference to the deleterious consequences to Ms. Bradley.

203.    The Defendants' intentional conduct causing Ms. Bradley the physical and emotional distress she suffered and continues to suffer was so outrageous in character, and so extreme in degree, to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully request that this Court:

1. Award Plaintiff past and future damages for loss of income, employment opportunities, injury to her reputation and all other wages and benefits denied to her

due to the improper and unlawful actions of Defendants in an amount in excess of $150,000.00 excluding interest and costs;

2.   Award Plaintiff damages in compensation for her physical and emotional distress, pain and suffering, mental anguish and humiliation in an amount in excess of $150,000.00 excluding interest and costs;

3.   Award punitive damages against the respective Defendants;

4.   Award reasonable attorney's fees, costs of litigation and expenses; and

5.   Award any further relief that is warranted.

## COUNT IV

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

204.   Plaintiff incorporates the foregoing and remaining paragraphs in this Complaint as though fully set forth at length herein.

205.   All Defendants, and each of them, knew or reasonably should have known, that the conduct described herein would and did proximately result in physical injury and emotional distress to Ms. Bradley.

206.   At all relevant times, all Defendants, and each of them, had the power, ability, authority and duty to stop engaging in the conduct described herein and/or to intervene or prohibit said conduct.

207.   Despite such knowledge, power and duty, Defendants negligently failed to act to stop engaging in the conduct described herein and/or to prevent or prohibit such conduct or otherwise protect Ms. Bradley.  To the extent such negligent conduct was perpetrated by certain Defendants, the remaining Defendants confirmed and ratified such conduct with the knowledge that Ms. Bradley's emotional and physical distress would thereby increase, and with a wanton and reckless disregard for the deleterious consequences to Ms. Bradley.

208.     As a direct and proximate result of Defendant's unlawful conduct, Ms. Bradley has suffered, and continues to suffer serious emotional distress, humiliation, anguish, emotional and physical injuries, as well as economic losses, all to her damage in amounts to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

1. Award Plaintiff past and future damages for loss of income, employment opportunities and all other wages and benefits denied to her due to the improper and unlawful actions of Defendants in an amount in excess of $150,000.00 excludng interest and costs;

2. Award Plaintiff damages in compensation for her physical and emotional distress in an amount in excess of $150,000.00 excludng interest and costs;

3. Award punitive damages against the respective Defendants;

4.   Award any further relief that is warranted.

Respectfully submitted,

**THE MAZUREK LAW FIRM, LLC**

By:              /s/ Edward S. Mazurek
Edward S. Mazurek (PA ID 50278)
717 South Columbus Boulevard
Suite 516
Philadelphia, PA 19147
(267) 243-3393
emazurek@mazureklawfirm.com


             /s/ Daniel J. Kearney
Daniel J. Kearney (PA ID 51259)
3 Mary Court
Glen Mills, PA 19342
(610) 361-4483
danjkearney@gmail.com

**ATTORNEYS FOR PLAINTIFF
COLLEEN M. BRADLEY**