**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

COLLEEN M. BRADLEY,                          :
                                             :
    Plaintiff,                               :
                                             :
v.                                           :
                                             :   CIVIL ACTION
                                             :
WEST CHESTER UNIVERSITY OF THE               :
PENNSYLVANIA STATE SYSTEM OF                 :   No. 15-2681
HIGHER EDUCATION, _et al.,_                  :
                                             :
    Defendants.                              :
_____

**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Colleen Bradley, through her attorneys, respectfully submits this

Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment.

**I.**    **INTRODUCTION**

This case is a classic whistleblower case in which a high performing government

employee discovered and reported to senior leaders of her employer acts of impropriety,

abuse and misuse of public funds by senior government officials.   As a result, she was

subjected to various acts of retaliation by her employer, which ultimately resulted in her

termination less than three weeks after engaging in protected speech in violation of her

First Amendment Rights.

At the heart of the controversy is speech that at its core involved corruption and

misrepresentations with multimillion impact on taxpayer funds.  This is at the highest

level of public concern, and as such it's clearly established the speech is entitled to the

highest rung of First Amendment protection.   However, as with most cases involving

constitutional law questions, a balancing of interests is required. The high public interest in the speech must be balanced against the government employer's interest in avoiding disruption and operating efficiently.

It is clearly established that the more tightly the First Amendment embraces the speech the more vigorous a showing of disruption to operations must be made. In this case, Defendant faces a truly heavy burden of showing disruption, and has not met that burden. Defendant produced no evidence that any material disruption in fact occurred; to the contrary, Defendant repeatedly complemented Plaintiff on the efficiencies her talent and perseverance brought to the budgeting group throughout her more than three years of dedicated service. If any disruption occurred, it was unilaterally and voluntarily caused by Defendant's cover up activity, which included converting Ms. Bradley's role from the strategic role set forth in her Job Description to a more clerical role, whereby he excluded her from important meetings in which strategic budgeting decisions were made, and then directed her to incorporate those decisions in budgets.

Defendant argues Plaintiff's speech was employee not citizen speech, and therefore not entitled to protection. That argument fails – it is well settled the content of the speech (significant government employee impropriety) and Defendant's admissions under oath that the speech was not within Plaintiff's ordinary duties clearly mandates a conclusion that the speech was citizen speech and protected. It is clearly established that the fact Plaintiff chose to speak internally as opposed to externally does not alter that conclusion.

Defendant's Motion for Summary Judgment with respect to Ms. Bradley's Section 1983 First Amendment Claim is groundless. Plaintiff hereby withdraws her state law claims of intentional and negligent infliction of emotional distress.

## II.  BACKGROUND

### A.  Statement of Facts[1]

**Plaintiff's Background, Hiring, Role and Performance; WCU Culture**

1.  Plaintiff was hired by West Chester University ("WCU") in November of 2011 to serve as the Director of Budget and Financial Planning. Pl. Dep. at 11:15-17; 15:15-18.

2.  WCU is a member school and subject to oversight of the Pennsylvania State System of Higher Education ("PASSHE"). Pl. Dep. at 28:18-23.

3.  WCU is the largest of the fourteen PASSHE member schools, having enjoyed continuous and substantial enrollment growth for the past ten years. Pl. Decl. at ¶1.

4.  Before joining WCU, Ms. Bradley, who holds a Master's degree in Finance, had over twenty years of experience in budgeting and finance, having served for eleven years as CFO of a private boarding school, and before that held a controller position at a Delmarva subsidiary and a CFO position at a Delaware bank. Pl. Dep. at 11:15 – 12:2.

5.  In a written performance evaluation delivered to Ms. Bradley on September 26, 2014, Defendant noted in Section IV under "Strengths" that Ms. Bradley had an "[e]xcellent background in finance and accounting." Def. Dep. at Exh. 70.

6.  In Defendant's approximately three and one-half years of experience supervising Ms. Bradley, she did not ever act in a dishonest way or behave in a way that would indicate to him she was not a person of high integrity. Def. Dep. at 8:11-13; 9:1-3.

---

[1]      Cited portions of Plaintiff's deposition transcript are attached hereto as Exhibit A, cited portions of Defendant's deposition transcript are attached as Exhibit B, and Plaintiff's Declaration

7.      Ms. Bradley's understanding of her role at the time of hire by WCU was based on the Job Description posted for the position. Pl. Dep. at 32:10-18. Defendant shared that understanding. Def. Dep at 26:17 – 27:68.

8.      The Job Description described Ms. Bradley's role as the "chief budget and financial planning officer" whose responsibilities would include responsibility for long term financial planning and for preparation, management and oversight of the operating budget. Pl Dep., Exh. D.1.

9.      Ms. Bradley took a significant pay cut to accept the position, from $143,000 as CFO of the Westown School, where she had worked for eleven years, to $101,450 that she would earn at WCU. Pl. Dep. at 12:8-10; 15:19-20.

10.     The opportunity at WCU was ideal to Ms. Bradley notwithstanding the pay cut for several reasons, including the opportunity to obtain free tuition for her four children, free tuition for herself to become a CPA, as well as better pension and health care benefits. Pl. Dep. at 13:9-21; 16:21 – 17-4.

11.     Also appealing to Ms. Bradley was the opportunity to finish her career at WCU and be groomed for the Vice President of Finance and Administration position occupied by Defendant Mark Mixner, who was planning on retiring in a few years. Ms. Bradley's hiring process was shepherded by Chris Fiorentino, then Dean of Business and Public Affairs, and now interim President of WCU, who interviewed her and was her liason to the search committee. Both Defendant and Fiorentino discussed with Plaintiff the goal of grooming her for Defendant's position upon his retirement. Pl. Dep at 18:4 – 19:12.

12.     At the time of his deposition on September 30, 2016, Defendant had provided notice of his retirement from WCU effective March 3, 2017. Def. Dep. at 17:16-21.

13.    Ms. Bradley reported to Defendant throughout her employment at WCU.  Pl. Dep. at 30:13-21.

14.    During her employment at WCU, Defendant provided Ms. Bradley with three formal written performance evaluations that were highly complimentary and favorable, with confirmation in each that Ms. Bradley was exceeding or substantially exceeding expectations in all categories.  Pl. Decl. ¶2, Exh. P-1, P-2, and P-3.

15.    The only written documentation Ms. Bradley ever received from Mr. Mixner that expressed material performance issues that did not meet expectations was the termination letter he delivered to her on November 18, 2014.   Pl. Decl. ¶3.  Defendant has produced no other written documentation critical of Ms. Bradley's performance.

16.    The November 18, 2014 termination letter that Defendant prepared with the assistance of Mr. Maloy, WCU's VP of Human Resources, cited several alleged performance issues that drove the decision to terminate Ms. Bradley's employment, namely, that WCU needed "a different type of leadership," she had problem solving deficiencies and communication issues, failed to understand big picture concepts, and that she wasn't meeting leadership needs.  Pl. Decl. ¶3; Exh. P-4.  Def. Dep. 137:1-20. All of these allegations are expressly contradicted in Defendant's formal written performance evaluations.

17.    In the last performance evaluation that Defendant delivered to Ms. Bradley on September 26, 2014, Defendant stated "[d]espite significant challenges and changes of direction from the Administrative Budget Committee (ABC), Colleen continued to develop and refine processes to **meet the needs of ABC and the University**."  Def. Decl. ¶2, Exh. P-3. (emphasis added).

18.     The termination letter makes no reference to Defendant basing his termination decision on Ms. Bradley allegedly undermining him, or her alleged insistence on a demotion at the same pay or refusal to do her job.

19.     Nor were those allegations made known to Ms. Bradley when she met with Defendant and Maloy on November 18, 2014 when they handed her the termination letter.  During that meeting, Defendant informed Plaintiff only that she was not the right "cultural fit" for WCU.  She asked him if she was not a cultural fit because she would not lie.  He merely responded "You are not the cultural fit."  Maloy said nothing of substance during the meeting.  Pl. Dep. at 76:14 – 77:15.

20.     Early on in her tenure, and thereafter, Ms. Bradley learned that senior leaders at WCU and PASSHE operated on a separate agenda, and contrary to what was represented in her Job Description, she was excluded from meetings and strategic discussions that would have fostered truthful reporting of financial data.   Pl. Dep. at 32:10 – 34:5; 34:20 – 36:5.

21.     Defendant and or other senior leadership selectively controlled the meetings Ms. Bradley could attend.  Pl. Dep. at 36:6 – 17.

22.     Early on in her tenure, Maloy, VP of Human Resources at WCU, confirmed by email to Ms. Bradley dated November 21, 2011, the exclusionary practices of the WCU senior leadership.  Therein, he expressed to her that "there was a cultural belief [at WCU] that decisions around money equal power, and power must be kept to a select few….Our strategic planning in general solicits broad input on important matters, which is promptly ignored….The *real*  process operates outside those more public feedback opportunities.

There is a lot of good here, but participative leadership isn't one of those good things." Pl. Dec, ¶4, Exh. P-5 (emphasis added).

23.     Ms. Bradley also found a culture of deceit and corruption that existed at WCU and PASSHE, and in her original Complaint cited and provided evidence of numerous instances thereof, which included acknowledgements by numerous senior leaders of the culture of deceit that existed.   For example, current President Fiorentino, in an email responding to concerns Ms. Bradley had expressed to him relating to misrepresented surplus numbers being reported to the WCU Council of Trustees ("WCOT"), expressed to Ms. Bradley that "[t]raditionally the reports to COT have been more art than science.  I have sat at presentations wondering how they could distort the facts so much and get away with it."  Def. Dep. Exh. 9. Moreover, the Pittsburgh Post Gazette, in an article published September 28, 2014, and citing campus emails obtained under the state's Right-to-Know Law, reported that top West Chester leaders engaged in what amounted to a stealth campaign to promote introduction and passage of Senate Bill 1275, the controversial secession legislation that PASSHE leadership opposed.  In doing so, they published the following quotes from Chancellor of PASSHE Frank Brogan, who said he had contacted West Chester officials about the matter. "I was told that it was not the administration at West Chester. It was the supporters of West Chester," Mr. Brogan said. **Asked if he believed that explanation, the chancellor replied: "Not for a minute.  I think it's an inappropriate use of time,"** referring to the apparent behind-the-scenes actions of campus officials to quietly promote the bill. Pl. Decl. ¶5, Exh P-6.

It is within the foregoing environment that the speech at issue in this matter took place.

**Deliberate WCU and Defendant Misrepresentations in PASSHE Budget Reports**

24.     Under Act 188 of 1982, 24 P.S. §§2-2001A, *et seq.* ("Act 188"), WCU is charged with providing high quality education at the lowest possible cost to its students.

25.     Under Act 188, the PASSHE Board of Governors (the "BOG") has adopted Policy 1993-03: Budgetary Reporting and Review (hereafter the "BOG Budget Policy"), under which System universities are required annually to submit a Budget Report to the Division of Finance and Administration of the Office of the Chancellor (hereafter the "DFAOC"), in a form established by the Chancellor, containing revenue, expenditure and supporting data for the prior fiscal year, current fiscal year, and the request fiscal year. The BOG Budget Policy provides further that the university submissions shall be shared in summary form with the BOG, and the BOG's review shall include assumptions for tuition rates and associated revenue, appropriations, and other sources of revenue, as well **as expenditure projections for the future fiscal year.** Pl. Decl. ¶6, Exh. P-7.

26.     In addition, under Act 188, in accordance with the rules and regulations of the BOG, the WCOT has a duty to review and approve the recommendations of the President with respect to the annual operating budget requirements for forwarding to the BOG. Moreover, under Act 188 the President has the duty to prepare and, after review and action by the WCOT, submit to the Chancellor the annual operating budget requirements for WCU.

27.     In accordance with ACT 188 and the BOG Budget Policy, the Chancellor issues each year a form of annual budget report that PASSHE universities must complete referred to at PASSHE and at member universities as a "BUD Report" and this report

forms the basis for appropriations.   Pl. Dep. at 40:10:15.  Def. Dep. at 65:1-5.  These

Budget Reports are required to be truthful and accurate.  Def. Dep. at 43:14-16.

28.     The obligation under ACT 188 for the President to submit BUD Reports to the

WCOT was not complied with by Defendant, the President or WCU during 2012-2014.

Def. Dep. at 41:14 – 42:6.

29.     On September 6, 2012, during her weekly meeting with Defendant, Ms. Bradley

raised a very specific concern about the draft BUD Report that she had prepared for

submission to PASSHE – namely that Ginger Coleman and Assistant Vice Chancellor

Lois Johnson of PASSHE had instructed her to make a change to the Transfer to Plant

line item in the draft BUD Report that would convert a multimillion dollar surplus into a

multimillion dollar deficit.  Pl. Decl. at ¶7; Pl. Dep. at 39:22 - 40:9.

30.     Ms. Bradley expressed to Defendant that she was uncomfortable reporting "false

numbers," to which Defendant responded it "was a political document," that she "just

needed to do it."  Pl. Dep. at 38:8-14.

31.     On September 19, concerned about PASSHE's and Defendant's position, Ms.

Bradley reviewed the issue with her mentor Fiorentino, who agreed with her that the

PASSHE directed adjustment to the Transfer to Plant line item was an outright

misrepresentation of numbers.  Pl. Dep. at 38:15-21.  Defendant had recommended that

Ms. Bradley consult with Fiorentino.  Def. Dep. at 77:23-78:1.

32.     Despite her questions to them, Johnson and Coleman never instructed Ms.

Bradley that the change from a large surplus to a large deficit was "appropriate."  All

they instructed was that the BUD Report was political and not following instructions

would put WCUs appropriation funding at risk.  Def. Dep. 66:5-10. Pl. Dep. at 37:19-25.

33.     Ms. Bradley specifically questioned Johnson and Coleman on how she was supposed to convert an $18 million surplus into a $2-$3 million dollar deficit.  They claimed that it was a "political document" that had nothing to do with internal financial statements, so she should simply put their number in and that was how she would get a deficit.  Pl. Dep. at 42:8-13.

34.  Ms. Bradley spoke to her counterparts at other universities, and the successful universities were each being asked to make similar adjustments, so that when rolled up into a consolidated budget that is presented to the Commonwealth, appropriations could be maintained.  Pl. Dep. at 44:5-18.

35.     Ms. Bradley believed that she was being asked to engage in fraud.  Pl. Dep. at 37:10-16.

36.     Against Defendant's instructions, Ms. Bradley reviewed with the WCU Administrative Budget Committee ("ABC") Members at the September 20, 2012 ABC meeting the misrepresentation in which she was being asked to participate.  She expressed that doing so was unethical and possibly illegal.  She expressed concern about the implications to state taxpayer dollars.  Pl. Dep. at 43:19-25; 45:24-25.  Defendant confirmed that Ms. Bradley was acting outside of the course and scope of her employment in so doing.  Def. Dep. 30:2-11; 30:24-31:4; 31:12-19.

37.     ABC member Mark Pavlovich called it "fraud, it's lying, it's outright lying."  Pl. Dep. at 46:8-11.

38.     A discussion ensued concerning other things PASSHE was making WCU do insofar as inflating headcount and other actions to keep money coming from the state.  Pl. Dep. at 46:12-17.

39.     Ms. Bradley felt better at the end of the meeting because certain ABC members concurred that if they were in Plaintiff's position, they would not make the adjustment either.  Defendant agreed to discuss the matter with Johnson to "see what he could do."  Pl. Dep. at 46:18-24.  Def. Dep. at 65:14-24.

40.     Defendant had that discussion with Johnson, who "said something to the effect that certainly if you are foolish enough not to follow our directions regarding the transfer to plant, that's your business, but you would be sending a message to the board of governors that you don't need the funding you are receiving."  Def. Dep. at 66:1-10.  At no time during that discussion with Johnson was there any discussion of WCU's actual needs or any other reason for the adjustment.  Def. Dep. at 66:21 – 67:13.  Pl. Decl. ¶8, Exh. P-8.

39.     Without further discussion with the ABC, and shortly after his discussion with Johnson, Defendant unilaterally made the adjustment to create a budgeted deficit of $2.25 million.  Def. Dep. at 66:15-20.  Defendant did not report to PASSHE or Johnson.  He reported to WCU President Weisenstein throughout the relevant period.  Def. Dep. at 40:8-12; 39:2-8.

40.     Shortly after the September 20 ABC meeting, Mixner reprimanded Ms. Bradley for using the term "unethical" in connection with the budget process with the group of university leaders.  Pl. Decl. ¶9.

41.     From that point on, Ms. Bradley's relationship with Defendant changed, and became more challenging although still functional.  She believed that he agreed with her, but would not support her in public circles.  Pl. Dep. at 52:12-24.

42.     Until the September 20, 2012 ABC meeting, Ms. Bradley facilitated those

meetings.  Pl. Dep at 37:10-16.  Defendant then assumed that role and never returned that function to Ms. Bradley.  Pl. Dep. at 47:9 – 48:25.

43.     At the next meeting of the ABC on September 27, 2012, Defendant informed the members of his conversation with Johnson, and said that he had changed the BUD Report to show an approximately $2.25 million deficit by adjusting the Transfer to Plant line item.  Pl. Decl. ¶8, Exh. P-8.

44.     Ms. Bradley submitted a memorandum to the ABC on September 27, 2012 in which she reiterated her serious concerns with respect to changing a surplus to a loss in the BUD Report; and expressing frustration that she had been informed that her credibility was damaged for doing so, and asked for someone in leadership to tell her it was okay. The purpose of the Memorandum was also to document to the ABC her objection to Defendant unilaterally submitting the false BUD Report to PASSHE in her name. She requested that it be resubmitted in Defendant's name.  Pl. Decl. ¶10, Exh. P-9.

45.     No one at PASSHE or WCU addressed Ms. Bradley's concerns.  Pl. Decl. ¶11.  In response to a question during his deposition to the effect that given the grave ethical concerns raised by Ms. Bradley in her Memorandum, might it have been important to respond to her in writing?  Defendant responded, "[i]t certainly was one possible option." And in response to the follow up question, "[a]nd you chose not to, Defendant responded, "As I recall, I did not."  Def. Dep. at 76:15-20.

46.     It was not part of Ms. Bradley's ordinary duties to investigate or report misrepresentations of financial information.  Def. Dep. at 30:2-11.

47.     It was not part of Ms. Bradley's duties to report to senior leaders of WCU outside of her chain of command what she in good faith believed to be unethical practices.  Def.

Dep. at 30:24-31:4.

48.     It was not part of Ms. Bradley's ordinary duties to report to senior leaders of West Chester University outside of her chain of command deliberate falsification of budget projections to maintain taxpayer funding.  Def. Dep. at 31:12-19.

49.     Neither the BUD Report nor the Transfer to Plant expenditure adjustment was submitted as required to the WCOT. Rather, Defendant actively concealed the Transfer to Plant line item from the WCOT.  Ms. Bradley had prepared for Defendant's review and ultimate distribution to the WCOT a draft Statement of Revenue and Expenses for fiscal 2011-2012, which had characterized the transfer to plant item as "Year End Transfers to Plant" in the amount of $11.27 million.  Def. Dep. Exh. 31.  The only change Defendant made to the report that was submitted was to rename "Year End Transfer to Plant," to "Facilities and Strategic Sustainability."   Pl. Decl. ¶19; Def. Dep. Exh. 30-31. Defendant could not explain why that change was made.  Def. Dep. at 47:20 – 49:10.

50.     On June 11, 2013, Ms. Bradley became concerned about her position.   Defendant informed her that Defendant and his colleagues on the ABC did not think she was the right "fit" for WCU, without explaining why she was not the right fit.  She attributed that to her ongoing vocal objections to reporting false numbers. Pl. Dep. at 57:9 – 58:22.  She believes with Fiorentino's intervention, her employment was continued.  *Id*.

51.     In September of 2013, as she was going through another cycle of the BUD Report, Ms. Bradley wrote to Defendant that she was "very uncomfortable with the direction of our entire budget process and I can feel the pressure at ABC to remain silent. I must trust you and the cabinet members are acting in the best interest of the University. However, I did not anticipate being in a position of constantly plugging numbers without

specifics…." Defendant thanked her for hanging in there. Compl. Pl. Decl. ¶12, Exh. P-10.  Additional misrepresentations were made by Defendant in the September 2014 BUD Report Cycle, and Ms. Bradley's concerns were shared by Bernadette Hinckle, Assistant Vice President of Finance. Pl. Decl. ¶13, Exh. P-11.

52.     Defendant and WCU presented false breakeven or near-breakeven budgets to the Commonwealth over three years, during which time and in part as a result of such false and misleading budgets, WCU received in excess of $146 million in taxpayer-funded appropriations. Despite presenting these loss deficit or breakeven budgets year after year, WCU's general and education fund net assets increased by $56.6 million, or over 100%, during 2012-2014.  Pl. Decl. ¶14.

53.     While cash reserves were accumulating through overstating expenditures in annual BUD Reports, as early as October of 2013 senior leadership of WCU was surreptitiously working on seceding from the Commonwealth using $30 million in taxpayer funds.  Def. Prod. No. WCU005347-5348.  This practice was criticized by Chancellor Brogan, who stated that taxpayers "believe that money is being used to provide them the professors, the support staff, the opportunity today to better their educational experience.  **They sure don't believe it's going to be squirreled away in part by those institutions [to] buy their way to quasi-private status.**" Pl. Decl. ¶15, Exh. P-12 (emphasis added).

**October 29, 2014 Enrollment Management Committee ("EMC") Meeting**

54.     In mid-October 2016, Ms. Bradley was asked by Defendant to prepare and present a budget and financial projections previously requested by University Opinion leaders (consisting primarily of Deans and other faculty members privately referenced by senior

leadership as the "difficult group") and to be presented at an open meeting to be held October 30, 2014. Pl. Dep. at 62:13 – 63:4; Pl. Decl. ¶16.

55.     Ms. Bradley was willing to do so only if she could also present a budget and financial projections that did not contain expenditure assumptions she knew to be false based on consistent historic experience and actual expectations, which Defendant informed her a few days before the meetings would be "not a problem, not a problem". Pl. Dep. at 65:11-22. She was highly concerned that misrepresentations in the budget would be presented to a large public group, including to many faculty. Pl. Decl. ¶16.

56.     Ms. Bradley was asked by Defendant and Pavlovich to attend a meeting of the EMC to take place on October 29, 2014, a day before the scheduled Opinion Leaders meeting scheduled for October 30, 2014. Pl. Dep. at 64:13-25.

57.     Ms. Bradley believed the purpose of the EMC meeting and the reason for her presence, as acknowledged by Defendant, was to discuss with the EMC the impact of enrollment numbers on the projections to be presented at the Opinion Leaders meeting. Def. Dep. at 120:2-7. Pl. Dep. at 65:25 – 66:4. Mixner instructed Ms. Bradley in an email sent late afternoon on the 28th that at EMC, they were going to use his version of the budget. Pl. Decl. ¶17, Exh. P-13.

58.     The meeting was attended by Lisa Yannick, who was in charge of Institutional Research, Lori Bernotsky, who was the Associate Provost, Joe Santivasci, who was in charge of Enrollment, Pavlovich, Fiorentino, Defendant and Ms. Bradley. Pl. Dep at 65, 2-8. Except for input on enrollment, none of these leaders were responsible for the WCU Budget or financial projections, but they had influence because of their leadership roles.

59.     Ms. Bradley, against Mixner's written direction, presented a version of the budget

and financial projections that did not include what she believed to be falsely inflated expenditures, and that "presents the reality," and to show misrepresentations in the Defendant's assumptions and projection model. That model, notwithstanding a projected increase in enrollment, projected an $11 million deficit in the year following a year in which actual surplus was $11 million. Pl. Dep. at 67:2 – 70:3. The members commented and agreed with Ms. Bradley that Defendant's Budget was not truthful, wrongfully presented a scenario that the sky was falling, and that Ms. Bradley should not present it. Mixner agreed to discuss it with the President. Pl. Dep. at 67:12-68:5; 70:21-71:4.

60.     Defendant's facial expressions and looks of disgust directed at Ms. Bradley during the meeting informed her he was angry that she had spoken out to the group. Pl. Dep. at 69:16-24.

61.     It was not within Ms. Bradley's ordinary duties to present her budget to the EMC at that meeting. Def. Dep. at 119:23 – 120:3.

62.     Defendant emailed Ms. Bradley late that evening and said he had spoken to the President and they were going to present to the Opinion Leaders his budget only. Pl. Dep at 69:10-15.

63.     As she had done when first engaged by Defendant in mid-October, Ms. Bradley reiterated to Defendant she would not present publicly a budget with misrepresented expenditure assumptions. Pl. Dep at 71:5-19.

64.     Ms. Bradley attended the Opinion Leaders meeting, because she was expected to do so. Pl. Dep. at 70:4-13. She sat in a roundtable group in the audience anonymously. Pl. Dep. at 14-20.

65.    Defendant presented the misrepresented budget at the Opinion Leaders meeting. Following Defendant's presentation, President Weisenstein asked the audience if anyone had any concerns or opinions. The head coach of the football team expressed that he knew they made $11 million the prior year and now he was seeing this huge red deficit again, asked how was that possible.  Weisenstein responded that they had Defendant to thank for that because he has such great expenditure control.  Pl. Dep. at 71:25 – 72:25.

65.    The ordeal for the preceding three years had taken a serious toll on Ms. Bradley's health.  In October of 2012 after the ordeal with the first BUD Report, she went out on FMLA leave and was very sick with shingles and other stress-related symptoms.   Pl. Compl. ¶88.  Pl. Dep at 78:17-20.  Those issues continued, and following the late October ordeal with the EMC and Opinion Leaders meetings, she continued to suffer health problems, emotional distress, participation in social events, and difficulties the stresses placed on her family.  She tried to find a new job, but had been unsuccessful.  Pl. Dep. at 73:21 – 74:4.

66.    On November 4, 2014, during her next regular weekly meeting with Defendant that followed the EMC and Opinion Leaders meetings, Ms. Bradley reiterated the stance she had maintained consistently over her three years at WCU – that she was unwilling to report false or fraudulent numbers.  She asked to be considered for another assignment, not necessarily a lesser role.  To make her position clear, she returned to Defendant's office and said explicitly that she was in no way quitting her job, she needed to support her family. Pl. Dep. at 74:5 – 75-25.  Defendant told her he understood, that he did not like "PASSHE's games" either, but that unfortunately that was part of the expectation to fulfill those job requirements.  Pl. Dep. at 74:14-17.  In no way did Plaintiff make an

ultimatum that she required a demotion at the same pay. She merely asked for consideration of other assignments where her talents, frequently commended by Defendant, could be deployed. Pl. Decl. ¶20.

67.     The next communication Ms. Bradley had with Defendant concerning her employment was the meeting with Maloy and Defendant on November 18, 2014, at which Defendant informed her that her employment with WCU would involuntarily terminate effective June 30, 2015.  Pl. Dep. at 76:2-15.

68.  Thereafter, in January of 2015, Ms. Bradley became very ill with shingles and related maladies, and was unable to work during parts of January and February and from April through June 30 during which she had to take unpaid FMLA leave.  Pl. Dep. at 78:11 – 80:11.  She suffered depression, anxiety, was physically vomiting, had constant diarrhea, and could not get out of bed.  She was not able to function, became withdrawn from her family, and felt very abused.  Pl. Dep. at 78:11-15.  She also contracted another case of extremely painful shingles.  Pl. Dep.at 78:23 -79:3; 89:24-25.

69.     Ms. Bradley returned to work in February, and was treated cruelly, insensitively, notwithstanding Defendant's knowledge of her shingles and illness.  For example, she was asked to sign off on her own replacement's request to hire form.  It was missing the date of termination for her role, so Defendant filled it in and sent it back to Ms. Bradley for signature.  She had to deliver it to HR.  Pl. Dep. at 79:7-14.  Johnson emailed her on January 21, 2015 her position opening.  Hinkle sent a notice that effective March 2015, Budget would be shifted to Finance and Administration.  Hinkle received a $10,000 raise.  Pl. Dec ¶18.

70.     Ms. Bradley continues to suffer physical and emotional distress from the ordeal.
Pl. Dep. at 90:2 -91:8.

**B.      Procedural History**

Ms. Bradley commenced this action by filing a Complaint on May 14, 2015 that
stated a First Amendment retaliation claim under 42 U.S. 1983, state law claims under
the Pennsylvania Whistleblower Law, and claims for intentional and negligent infliction
of emotional distress. The Complaint named WCU, PASSHE, and several of their senior
leaders, as defendants.

On July 20, 2015, Defendants moved to dismiss Ms. Bradley's Section 1983
claim and supplemental state law claims for lack of subject matter jurisdiction pursuant to
Federal Rule of Civil Procedure ("Rule") 12(b)(1). *See* Doc. No. 3. Defendants also
moved to dismiss all claims under Rule 12(b)(6) for failure to state a cause of action.  In
their Motion to Dismiss, Defendants annexed two exhibits that were not annexed to Ms.
Bradley's Complaint.

On November 12, 2015, following briefing on Defendants' Motion to Dismiss,
the Court ordered that counsel for both parties address whether the Court must convert
Defendants' Motion to Dismiss into a motion for summary judgment pursuant to Rule
12(d), given Defendants' Motion contained matters outside the pleadings.  *See* Doc. No.
6.  Counsel for Plaintiff and Defendants submitted memoranda that they opposed
conversion.

On December 9, 2015, the Court entered an Opinion and Order dismissing the
Complaint in full. *See* Doc. Nos. 9, 10. The Court dismissed with prejudice the Section
1983 claim against PASSHE and WCU and the individual Defendants in their official

capacities pursuant to the Eleventh Amendment; however, the Court dismissed the claims against the individuals in their individual capacities without prejudice to Plaintiff amending her Complaint to state a claim against the Individual Defendants in their individual capacity. In doing so, the Court advised that it will require Plaintiff to restate her allegations under Rule 8's "short and plain statement" requirement, noting that there was no need to include such a large number of paragraphs or attach any exhibits, and that Plaintiff reexamine whether all Defendants must be sued for her to get relief, and to allege facts showing individual liability with respect to each Defendant named.

The Court also allowed Plaintiff to restate her state law claims in an amended complaint, without ruling on them. *See id.* at 10 n.6.

On January 15, 2016, Plaintiff filed her First Amended Complaint ("FAC"), stating individual capacity First Amendment retaliation claims under Section 1983 against the all the state officials, except Ginger Coleman, state law claims under the Pennsylvania Whistleblower Law, and claims for intentional and negligent infliction of emotional distress. *See* Doc. No. 16.

On February 1, 2016, Defendants filed their Second Motion to Dismiss all of Ms. Bradley's claims against all Defendants pursuant to Rules 12(b)(1) and 12(b)(6). Following briefing, the Court dismissed all claims except for the Section1983 First Amendment Claim against Defendant in his individual capacity and two common law emotional distress claims against Defendant.

On October 31, 2016, Defendant filed a Motion for Summary Judgment on the

Section 1983 First Amendment and two emotional distress claims.[2]

## III. ARGUMENT

### A. Summary Judgment Standard

As this Court is well aware, summary judgment is not appropriate unless "'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Henry v. Acme #7871, et al.*, No. 11-5505 (E.D.Pa. Feb. 25, 2014) *quoting* Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett*, 477 U.S. 317, 32 -23 (1986). A factual dispute is material when it "might affect the outcome of the suit under the governing law . . . ." *Id. quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In considering a motion for summary judgment, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Id. quoting Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The party opposing the motion, however, cannot "rely merely upon bare assertions, conclusory allegations or suspicions" to support a claim. *Id. quoting Fireman's Ins.Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (citations omitted). The party asserting a fact "must support the assertion by . . . citing to particular parts of material in the record. . . ." *Id. quoting* Fed. R. Civ. P. 56(c)(1)(A).

Applying the foregoing principles to this case, Defendant's summary judgment motion does not withstand scrutiny.

---

[2] Ms. Bradley withdraws her claims for intentional and negligent infliction of emotional distress.

**B.** **Defendant's Motion for Summary Judgment Should Be Denied Because Plaintiff Can Prove Actionable Claims for First Amendment Violations and Defendant has not Established Qualified Immunity Viewing the Facts in a Light Most Favorable to Plaintiff and Drawing All Reasonable Inferences in Her Favor.**

Defendant's position, in essence, is that he is entitled to qualified immunity with respect to Ms. Bradley's Section 1983 First Amendment retaliation claim, because the evidence does not establish a First Amendment Claim, and even if it does, any theory in support thereof was not based on clearly established law. Def. Mem. at 5. To the contrary, under clearly established law, the evidence most clearly establishes a First Amendment retaliation claim, particularly when viewed under the applicable standard of review viewing the facts in the light most favorable to Ms. Bradley and drawing all reasonable inferences therefrom.

**1.** **Ms. Bradley's First Amendment Claims are Actionable as a Matter of Law.**

This case raises the question of the degree to which the First Amendment to the U.S. Constitution offers protection for public employees who report within the workplace to other non-supervisory co-employees in senior leadership positions misconduct, or misrepresentations, or improprieties by senior public officials with respect to taxpayer funds. In sum, this case concerns a whistleblower exercising First Amendment rights to expose and prevent further public corruption, not an employee seeking to "constitutionalize an employee grievance" as implied by Defendant. *See* Def. Memo at 6.

"[C]itizens do not surrender their First Amendment rights by accepting public employment." *Lane v. Franks*, 573 U.S.____, 134 S.Ct. 2369, 2377 (2014). In *Lane*,

the unanimous Supreme Court emphasized that "[t]here is considerable value, moreover, in encouraging, rather than inhibiting, speech by public employees. For '[g]overnment employees are often in the best position to know what ails the agencies for which they work.'" *Id.* (quoting *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). In addition, "[i]t may often be the case that, unless public employees are willing to blow the whistle, government corruption and abuse would persist undetected and undeterred." *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 (9th Cir. 2013) (en banc), *cert. denied*, 134 S. Ct. 1283 (2014). Moreover, the unanimous Court in *Lane* stressed that "[i]t bears emphasis that our precedents dating back to *Pickering* have recognized that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at , 134 S.Ct. at 2379. "The importance of public employee speech is especially evident in the context of … (a) case… (involving) public corruption." 134 S.Ct. at 2380. The Court in *Lane* further held that the content of Lane's protected speech "**corruption in a public program and misuse of state funds, obviously involves a matter of significant public concern.**" *Id.* (emphasis supplied).

The public employee's and public's interest in freedom of expression in matters of public importance, however, must be balanced against the government's interest in the efficient operation of its workplaces. *Pickering* v. *Board of Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968). "However, **in the classic whistleblower case the state has no legitimate interest in covering up corruption**…. As an inevitable result of the Court's jurisprudence and sound public

policy, the First Amendment generally protects public employee whistleblowers from employer retaliation." *Dahlia*, 735 F.3d at 1067 (emphasis supplied).

In this Circuit, "[t]o establish a First Amendment retaliation claim, a public employee must show that his speech is protected by the First Amendment and that the speech was a substantial or motivating factor in what is alleged to be the employer's retaliatory action." *Flora v. County of Luzerne,* 776 F.3d 169 (3d Cir. 2015) (*citing Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009)).

Such protection for a citizen's speech exists when "(1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made. *Flora* at 175 (quoting from *Hill v. Borough of Kutztown*, 455 F.3d 225, 241-242 (3d Cir. (2006), in turn quoting from *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)(internal quotation marks omitted). For purposes of summary judgment, Defendant challenges only the requirements of factors (1) and (3) above, in effect conceding and glossing over the second factor concerning whether the speech involves a matter of public concern. As will be discussed below, however, in any First Amendment analysis, the gravity of the speech, and it's impact on the public interest, is an essential consideration in balancing the competing interests at stake and the level of protection afforded.

### (a) Plaintiff spoke as a citizen, not an employee.

This citizen requirement was derived from the *Garcetti* decision, recently reiterated in *Lane*, in which the Court emphasized that "[t]he *critical question* under

*Garcetti* is whether *the speech at issue is itself ordinarily* within the scope of an

employee's duties, not merely whether it concerns those duties." *Lane*, 573 U.S. at

___, 134 S. Ct. at 2379. The fact that an employee expresses his "views inside his

office, rather than publicly, is not dispositive. Employees in some cases may receive

First Amendment protection for expressions made at work." *Garcetti,* 547 U.S. at

420, 130 S.Ct. 2379 (emphasis added). Nor is it dispositive that speech concerns the

subject matter of an employee's employment. "The First Amendment protects some

expressions related to the employee's job." 547 U.S. at 421.

Moreover, as highlighted by the Third Circuit in *Dougherty v. School District of

Philadelphia,* 772 F.3d 979 (3d. Cir. 2014), "[t]he *Garcetti* Court explicitly declined to

advance a framework for defining when an employee speaks pursuant to his official

duties, explaining that '[t]he proper inquiry is a practical one.' This reflects 'the

enormous variety of fact situations' in which a public employee claims First

Amendment protection. *Id.* at 418." *Dougherty* at 988 (*quoting Garcetti*, 547 U.S. at

424 and *Pickering*, 391 U.S. at 569, respectively, internal citations omitted). It is also

notable that the *Garcetti* Court did not have to determine whether the internal

Memorandum in issue (that the Assistant District Attorney plaintiff wrote in which he

evaluated a case at the specific request of his employer) was part of the plaintiff's job

duties; the plaintiff admitted as much. *Garcetti* at 421, 424.

Defendant's argument is essentially based on factors surrounding the speech,

and a mischaracterization of the nature and gravity of the speech, the latter two of

which, as reflected in the decisions cited above, are critical to First Amendment

protection analysis. In essence, Defendant argues that because Ms. Bradley was

speaking internally to committees on "budget issues" or "budget process" relating solely to the "special knowledge" and "experience" she acquired by virtue of her job duties and position as Director of Budgeting, that must be dispositive with respect to whether she was speaking as an employee or citizen. Def. Mem. at 7-8. This position is misguided, as made clear by the Court's teachings in *Lane* that speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment. They know best what ails the agencies for which they work. *Supra* at 22.

Characterizing plaintiff's speech as speech on "budget issues" or Budget process" is also misguided and is an attempt to minimize and hide what was at the core of the speech, which was Ms. Bradley's expression of very serious concerns about deliberate and isolated misrepresentations in most cases of a single line item in a budget by senior public officials to obtain or maintain public funding or otherwise mislead and impact the rights of faculty and others in the WCU community. If this case was merely about differences of opinion in budget processes, or how to properly construct a budget, it's unlikely this case would exist, Ms. Bradley's concerns would likely have been addressed. It is because of the corruption and cover up that Ms. Bradley over three years never received the answers she was seeking and also the reason her speech had special value.

Importantly, Defendant's position that Ms. Bradley's speech was within her ordinary duties as budget director is directly contradicted by his own testimony in his deposition. Defendant confirmed in his deposition it (1) was **not** part of Ms. Bradley's ordinary duties to investigate or report misrepresentations of financial information, Def.

Dep. at 30:2-11; (2) it was **<u>not</u>** part of Ms. Bradley's duties to report to senior leaders of WCU outside of her chain of command what she in good faith believed to be unethical practices. Def. Dep. at 30:24-31:4; and (3) it was **<u>not</u>** part of Ms. Bradley's ordinary duties to report to senior leaders of West Chester University outside of her chain of command deliberate falsification of budget projections to maintain taxpayer funding. Def. Dep. at 30:2-11; 30:24-31:4; 31:12-19. It was **<u>not</u>** within Ms. Bradley's duties to expose the corruption, in fact she did so at great risk.

It is also important to note that none of the cases cited by Defendant to support his position involved speech pertaining to public corruption, which are entitled to a higher level of First Amendment protection. It is precisely this type of case, where all the evidence confirms a high performing employee that exposes public corruption, and is retaliated against, that the First Amendment is to be given its broadest scope of protection.

Nor is the fact that Ms. Bradley chose to report and expose the misconduct internally to University Leaders outside of the inner circle and her chain of command dispositive. Ms. Bradley's First Amendment rights do not depend on whether she initially chose to speak and seek to resolve the matter internally versus speaking to the *Philadelphia Inquirer*. *See Garcetti,* 547 U.S. at 420.

Defendants' reliance on *Gorum v. Sessoms*, 561 F.3d 179, 186 (3d Cir. 2009) is misplaced. There, the court concluded that plaintiff was not speaking on a matter of public concern, rather an isolated incident involving a single employee. *Id*. at 187.

Moreover, the *Gorum* court's reliance on special knowledge obtained through

the plaintiff's employment is clearly refuted by *Lane*. The *Gorum* court based its holding in part on the following: "It was Gorum's special knowledge of, and experience with, the DSU disciplinary code that made him de facto advisor to all DSU students with disciplinary problems. It was through his position as a professor and department chair, moreover, that Gorum was able to aid Morris and serve as his advisor at a disciplinary hearing." *Id*. at 186 (internal quotations and citations omitted). The Court in *Lane* emphasized that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee – rather than citizen – speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane*, 573 U.S. at     , slip op. at 10.

Accordingly, Defendant's position that Ms. Bradley was speaking as an employee and not citizen must fail.

**(b)** ***Defendant's decision to terminate Plaintiff was not justified based on his needs as an employer.***

The third prong under *Flora* requires an analysis of whether the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement made. Defendant argues that application of the *Pickering* balancing test in determining whether the third prong has been met mandates a conclusion that no First Amendment violation occurred. Def. Mem. at 11. Defendant is wrong.

The *Pickering* balancing test requires the public employee's and public's interest in freedom of expression in matters of public importance to be balanced against the government's interest in the efficient operation of its workplaces. *Pickering* v. *Board of*

*Ed. of Township High School Dist. 205, Will Cty.*, 391 U. S. 563, 568 (1968). "However, **in the classic whistleblower case the state has no legitimate interest in covering up corruption**…. As an inevitable result of the Court's jurisprudence and sound public policy, the First Amendment generally protects public employee whistleblowers from employer retaliation." *Dahlia*, 735 F.3d at 1067 (emphasis supplied). The "more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made." *Hyland v. Wonder*, 972 F.2d 1129-139 (9th Cir. 1992).

Defendant now complains about the way Ms. Bradley allegedly challenged him in open meetings, and the tone she allegedly used. First, Ms. Bradley disputes that her tone was in any way inappropriate. Second, assuming without admitting that covering up the corruption that was occurring at WCU over three years could serve as a legitimate interest, Defendant left Ms. Bradley little choice but to speak publicly about the misrepresentations in group settings to try to rectify them by bringing the malfeasance to the attention of other leaders with influence. She gave him every opportunity to explain to her why what he was asking her to do was appropriate, and he never did so and has not produced any evidence he did so, other than the need to "play PASSHE's games" and that the BUD Reports were simply "political."

In addition, there is no evidence in the record that Ms. Bradley's speech had any disruptive impact on operations. To the contrary, a review of Ms. Bradley's personnel file from September 20, 2012 forward yields no evidence that she had any negative impact on the operations of WCU. Defendant himself in his evaluations of Plaintiff and other correspondence frequently commended improvement in efficiencies as a result of Ms. Bradley's talent, perseverance and effort. Pl. Decl. ¶2, Exh. P-1-P-2 and P-3.

Moreover, he simply ignored her repeated recommendations to make reporting more transparent and truthful.

> **(c)** **There is a clear causal link between Plaintiff's speech and the termination decision.**

Defendant argues there was no causal link between Ms. Bradley's termination and her speech, arguing in essence that the evidence fails to show both an unusually suggestive temporal proximity of the speech and the termination, and a pattern of antagonism coupled with timing under *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3rd 259, 267 (3d Cir. 2007). Def. Mem. at 13-14. Again, Defendant's disingenuous arguments fail.

Defendant argues that because (1) Ms. Bradley testified in her deposition that her complaints from September 2012 through October 2014 all involved the same topic (which at their core they did – corruption by public officials); (2) allegedly during those 25 months there was no retaliatory conduct (which Ms. Bradley disputes); (3) Plaintiff's actions at the EMC meeting were no different than what had been happening for some time (again disputed); and (4) that the only extraordinary event that allegedly happened was Plaintiff telling Defendant she could no longer do the job and requesting a demotion at the same level of pay (again which Plaintiff disputes) - the only rational conclusion a jury could reach was that it was Plaintiff's request for a demotion that caused his decision. Defendant then asserts that there is no unusually suggestive temporal proximity allegedly because of the two years that Plaintiff had been complaining about the corruption. Def Mem. at 13.

This rationale fails for multiple reasons, including that Plaintiff disputes the factual assertions made by Defendant in points (2) through (4). Furthermore, Defendant

completely overlooks the audience for the EMC speech, a factor (who the audience is) Defendant highlights in its failed argument that Plaintiff was speaking as an employee. While certainly not dispositive to the First Amendment protection, the audience for the EMC speech differed in many respects from the audience for the ABC speech, both in terms of function and constitution. This is important more so in terms of the motivation for the termination of Ms. Bradley. The EMC audience had no budgetary authority as a committee and individually. They did have influence, however, as senior leaders with good potential to address corruption. This was evidenced by Defendant agreeing at the meeting to address with the President the concerns Ms. Bradley raised through her speech to the EMC.

The EMC's knowledge of the corruption was indeed an extraordinary event. Ms. Bradley asserts that her speech to leaders outside of the inner circle presented great risk to Defendant's efforts to conceal the ongoing corruption, and that this was a motivating, if not substantial basis for the termination decision that was implemented a few weeks later. Pl. Decl. ¶21. Ms. Bradley's emotional state from the ordeal was unstable and volatile, she had expressed her concerns outside of the inner circle for the first time, and it is more than reasonable to infer there was likely great apprehension within that circle and at the President level who was aware of the speech that Ms. Bradley would eventually express her concerns to an even broader audience. There is indeed unusually strong suggestive temporal proximity between the EMC speech on October 29, 2014 and her notice of termination given on November 18, 2014, particularly when viewed in the context of a termination letter that was silent on the alleged requested demotion with equal pay, as well as potential disruption Ms. Bradley could cause, the alleged reasons

Defendant now argues formed the basis of the termination decision, a letter that is directly contradicted by a formal written performance evaluation Defendant delivered to Ms. Bradley less than seven weeks before.

Moreover, Plaintiff disputes Defendant's position that being stripped of her authority to facilitate ABC meetings was a one-time event and the only retaliation she was subjected to. This was an ongoing diminishment of her role with other senior leaders. She was subjected to ongoing retaliation in numerous forms. She was frequently silenced and berated at ABC meetings. Pl. Decl. ¶25; Exh. P-10. She was ostracized and excluded from meetings at which important budgetary decisions affecting her role were made, contrary to the role of chief budgeting officer described in her Job Description that she relied on at the time of her hire. Pl. Dep. at 32:10 – 34:5; 34:20 – 36:5; Pl. Dep. at 36:6 – 17. Defendant does not dispute that the Job Description was consistent with his expectations for Ms. Bradley's role at the time of her hire. Def. Dep at 26:17 – 27:6. She was never groomed for Defendant's position as discussed with Defendant and Fiorentino at the time of her hire. Pl. Dep at 18:4 – 19:12. The evidence establishes an ongoing pattern of retaliation, which she believed caused two bouts of shingles and other maladies that caused her great physical pain and eventually rendered her socially and functionally dysfunctional. Pl. Dep. at 78:11-15; 78:23 -79:3; 89:24-25.

        2**.**     **Defendant Knew He was Violating Ms. Bradley's First Amendment Rights and It is Clearly Established Plaintiff Engaged in Protected Speech.**

First, it is Plaintiff's position, based on the record – that Defendant knew or strongly suspected Ms. Bradley had First Amendment Rights with her speech and he was violating them with each instance of retaliation, including her termination. In fact, any

sentient adult could not help but have known. Defendant belatedly cries "foul" over all the alleged difficulties Ms. Bradley's speaking out allegedly against him caused him, to the point that it formed the basis of or was a substantial factor in his decision to terminate her. During the more than three years that Ms. Bradley voiced objection to the deliberately and artificially inflated Transfer to Plant line item, Defendant took no formal action to discipline her, and has produced no evidence that he did so. Instead he tried to manipulate and coerce Ms. Bradley into thinking that by speaking out and raising ethical concerns, she was damaging her credibility with certain members of senior leadership who were involved in the corruption cover up. Pl. Dep.at 78:23 -79:3; 89:24-25.

This is further evidenced by the contrived reasons for termination specified in Ms. Bradley's termination letter, which were directly contradicted in a formal written performance evaluation Defendant personally provided to Ms. Bradley on September 26, 2014, less than seven weeks before her notice of termination was delivered. Defendant's knowledge that he was violating Ms. Bradley's First Amendment rights is a question of fact, established by the record or from the support in the record can be reasonably inferred, and should be put to a jury, because even under the decisions cited by Defendant to support his position, if Defendant knew he was violating her First Amendment rights, this would suffice to meet this prong of the analysis.

Second, regardless of Defendant's knowledge, here Defendant's conduct violated clearly established law and therefore he is not entitled to qualified immunity. Defendant hinges his argument on that proposition that because "there is no Supreme Court or Third Circuit case law clearly establishing that someone in the position of budget director who criticizes the budget process to two university committees has engaged in citizen speech,

that Ms. Bradley cannot establish that Defendant's conduct violated clearly established law.  Def. Mem. at 15.  While generalized statements of constitutional rights will not meet the requisite standard, the level of specificity for which Defendant argues is certainly not required.

The often-cited decision of the Supreme Court concerning the level of specificity required, *Anderson v. Creighton,* 483 U.S. 635 (1987), cited by Defendant, is instructive:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties" by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages."
>
> It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, *see Mitchell, supra,* at 472 U. S. 535, n. 12; but it is to say that, in the light of preexisting law, the unlawfulness must be apparent.

*Anderson*, 483 U.S. qt 639-640 (citing *Malley Malley v. Briggs,* 475 U. S. 335, 344-345(1986); *Mitchell v. Forsyth,* 472 U. S. 511,  528 (1985); *Davis v. Scherer,* 468 U. S. 183, 468 U. S. 191, 195 (1984).  *See also Ashcroft v. Al-Kidd,* 131 S.Ct. 2074, 2083 (2011)("We do not require a case directly on point…."); *Hope v. Pelzer,* 536 U.S. 730,

741, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (In some cases "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful (quoting *United States v. Lanier,* 520 U.S. 259, 271, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (internal quotation marks and citation omitted)). Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id.

Application of that principle in the Third Circuit in the First Amendment context is well demonstrated by the court in in its precedential decision in *McGreevy v. Stroup*, et al. 413 F.3d 359 (3rd Cir. 2005).  Therein the court stated:

> As a general matter, a right is 'clearly established' when the contours of the right are 'sufficiently clear' that a reasonable official would understand that what he is doing violates that right." Saucier, 533 U.S. at 202, 121 S.Ct. 2151. To be 'clearly established' does not mean that 'the very action in question has previously been held unlawful,' *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002); rather it merely means that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent. *Wilson v. Layne,* 526 U.S. 603, 615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Indeed, the Supreme Court has made clear that 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.' *Hope*, 536 U.S. at 741, 122 S.Ct. 2508.
>
> In the case before us, the illegality of the officials' actions was 'sufficiently clear that they can fairly be said to have been on notice of the impropriety of their actions.' *Kinney*, 367 F.3d at 372. Defendants have not proffered any legitimate countervailing interests in limiting McGreevy's speech, much less a countervailing interest which would outweigh McGreevy's interest in addressing matters of such weighty public concern. **When the balance of cognizable interests weigh so heavily in an employee's favor**, our cases make plain that the law is clearly established.

*McGreevy*, 413 F.3d at 366-367 (emphasis added).

In determining whether McGreevy's First Amendment rights had been violated, the court stated as follows:

Although McGreevy's speech did concern matters of public interest, it is protected speech only if the court also finds that her interests in the speech outweigh the state's countervailing interests in the 'efficiency and integrity in the discharge of official duties, and [in maintaining] proper discipline in the public service.' *Connick*, 461 U.S. at 150-51, 103 S.Ct. 1684. **The "more tightly the First Amendment embraces the speech the more vigorous a showing of disruption must be made**." *Hyland v. Wonder*, 972 F.2d 1129-139 (9th Cir.1992).

'*Speech involving government impropriety occupies the highest rung of First Amendment protection*.' *Swineford v. Snyder County Pa*., 15 F.3d 1258, 1274 (3d Cir.1994). Therefore, **defendants in the present case bear a truly heavy burden**. We agree with the District Court that "**there is no allegation on the part of Defendants that Plaintiff's conduct greatly disrupted the functioning of the Bermudian Springs elementary school**." App. at 18. Because no substantial countervailing administrative interest has been proffered, we hold that for summary judgment purposes, McGreevy's speech was protected by the First Amendment.

*McGreevy*, 413 F. 3rd at 465.

In this matter, Defendant does not dispute Ms. Bradley's speech involved a matter of public concern. In fact, given it involved government impropriety it is entitled to the "highest rung of First Amendment protection." *Id*. Defendant asserts Plaintiff spoke as an employee and not a citizen, yet both the content of the speech and Defendant's own admissions that the speech was not within Ms. Bradley's ordinary duties, key factors in determining the employee verses citizen speech, clearly establish Ms. Bradley spoke as a citizen. In terms of the government's interest in an efficient workplace, there is no interest in covering up government corruption. Furthermore, when balanced against the grave public concern with respect to the speech, Defendant has not established any disruption, and the documents in evidence make clear there was no disruption. Accordingly, this court should find, as did the court in *McGreevy*, that Ms. Bradley can show that her First Amendment rights were violated by unlawful retaliation and that these rights were clearly established.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that Defendant's Motion

for Summary Judgment be denied.

Respectfully submitted,

/s/ Edward S. Mazurek

Edward S. Mazurek (I.D. 50278)
THE MAZUREK LAW FIRM, LLC
717 S. Columbus Blvd.
Suite 516
Philadelphia, PA 19147
267.243.3393
emazurek@mazureklawfirm.com

/s/ Daniel J. Kearney

Daniel J. Kearney
6 East Hinckley Avenue
Ridley Park, PA 19078
danjkearney@gmail.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned, hereby certifies that a true and correct copy of the forgoing Plaintiff's Memorandum of Law in Opposition to Summary Judgment was served upon counsel for the Defendants through this Court's ECF System to the e-mail addressee listed in the Court's ECF System as follows:

KEVIN R. BRADFORD kbradford@attorneygeneral.gov,

STEPHEN R. KOVATIS skovatis@attorneygeneral.gov,

**November 21, 2016**                            **/s/ Edward S. Mazurek**