IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| COLLEEN M. BRADLEY<br><br>v.<br><br>WEST CHESTER UNIVERSITY OF THE PENNSYLVANIA STATE SYSTEM OF HIGHER EDUCATION | CIVIL ACTION<br><br>NO. 15-2681 |
| --- | --- |

<u>MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

In this First Amendment retaliation action, Defendant Mark Mixner moves for summary judgment on Plaintiff Colleen M. Bradley's claim arising under Section 1983. Plaintiff, who worked under Mixner for over three years as the Director of Budget and Financial Planning ("Budget Director") for West Chester University ("West Chester" or the "University"), contends that Mixner decided not to reappoint her to her position because she engaged in speech protected under the First Amendment. Mixner seeks summary judgment on the ground that he is entitled to qualified immunity. For the reasons discussed below, we agree with Mixner and the motion will be granted.

I.  Facts

The following is a fair account of the undisputed factual assertions at issue in this case. Plaintiff was hired as the Budget Director for West Chester in November 2011 and she maintained that position until June 30, 2015. ECF No. 29, Def.'s Mot. for Summary Judgment ("Def.'s Mot."), Def.'s Statement of Undisputed Facts ("DSOF") ¶ 2. Throughout Plaintiff's employment with West Chester, her immediate supervisor was Mixner, the Vice President of Finance and Administration. Id. ¶ 4. Plaintiff's job description included several responsibilities relating to management of the budget creation process at West Chester, including reviewing and

1

recommending improvements to that process.  Id. ¶ 7.  As part of her regular job duties she attended meetings held by the Administrative Budget Committee ("ABC"), weekly meetings with Mixner, and meetings of other committees as directed by Mixner.  Id. ¶¶ 12, 13.  At some point during the first year of her tenure at West Chester, Plaintiff concluded that the process by which she was instructed to create the budget was flawed and that the end result would not reflect the actual financial situation of the university.  ECF No. 31, Pl.'s Opposition to Def.'s Mot. ("Pl.'s Opp'n"), Pl.'s Statement of Undisputed Facts ("PSOF") ¶ 29.  Specifically, Plaintiff alleges that she was told by two individuals at the Pennsylvania State System of Higher Education ("PASSHE"), the administrative body to whom West Chester's annual budget report is submitted, to change a line item in the report such that "a multimillion dollar surplus [would be converted] into a multimillion dollar deficit."  Id.  She believes that this method was used as a way for West Chester to gain more taxpayer dollars than its true financial status merited.  Pl.'s Opp'n at 26-27.

Plaintiff first voiced her concerns about this to Mixner privately, during their weekly meeting on September 6, 2012.  PSOF ¶ 29.  Mixner told Plaintiff she should do as the PASSHE employees said and that the budget "was a political document."  Id. ¶ 30.  On September 20, 2012, Plaintiff attended the ABC meeting and expressed the same concern—that the way West Chester created its budget was unethical.  Id. ¶ 36.  Mixner was displeased that Plaintiff "us[ed] the term 'unethical' in connection with the budget process with the group of university leaders" and told her that "she [had] put her credibility at risk and that he would now facilitate ABC meetings."  Id. ¶ 40; DSOF ¶ 22.  After that meeting, Plaintiff "continued to complain to Mixner . . . about the budget practices" and Mixner was "more stern" with Plaintiff, but their relationship was not impaired enough so as to be reflected in Plaintiff's performance reviews from that time

period, which are all positive, nor as to cause Mixner not to reappoint Plaintiff to her position in June 2013.  DSOF ¶¶ 24-25; Pl.'s Opp'n, Exs. 2, 3 (performance evaluations covering period from 7/1/2012 to 6/30/2014); DSOF ¶ 27 ("In June 2013, Mixner offered to reappoint [Plaintiff] as Director of Budget and Financial Planning.").

The issue came to a head again on October 29, 2014, when Plaintiff, at Mixner's direction, attended a meeting of West Chester's Enrollment Management Committee ("EMC"). DSOF ¶¶ 31-32.  Prior to the meeting, Mixner and Plaintiff spoke about which version of the budget she would present—his version, which she believed to be misrepresentative of the university's financial situation, or hers—and Mixner told her to use his.  Id. ¶ 34.  Plaintiff began by presenting Mixner's budget but then subsequently presented her own, which she asserted depicted "reality."  Id. ¶¶ 35-36.  Her audience at the EMC meeting included five "senior administrators," including the Associate Provost and the now President, then Dean of Business and Public Affairs, Chris Fiorentino.  PSOF ¶¶ 11, 58; DSOF ¶¶ 33.  The following day, there was a meeting of various West Chester "opinion leaders," including the University's president, at which Plaintiff and Mixner were scheduled to present the budget report and financial projections. PSOF ¶¶ 62-63; DSOF ¶ 37-38.  Prior to the meeting, Mixner told Plaintiff that he had spoken with the president and they had decided that only Mixner's budget would be presented.  PSOF ¶ 62.  Plaintiff responded that she was unwilling to present Mixner's version of the budget, and so Mixner presented it.  Id. ¶¶ 63-64.

Shortly thereafter, on November 4, 2014, Plaintiff met with Mixner and asked to be considered for another role at West Chester.  Id. ¶ 41; ECF No. 31, Pl.'s Response to DSOF ¶ 41. Mixner said he would consider it but then, two weeks later, informed her that upon the expiration of her current employment contract on June 30, 2015, she would not be reappointed to her

position.  DSOF ¶ 43.

## II.   Procedural History

Plaintiff filed suit on May 14, 2015, alleging a First Amendment retaliation claim under 42 U.S.C. § 1983, state-law claims under the Pennsylvania Whistleblower Law, and negligent as well as intentional infliction of emotional distress (ECF No. 1).  Plaintiff brought all claims against the following defendants: West Chester, PASSHE, Mixner, Lawrence A. Dowdy, Dr. Gregory R. Weisenstein, Dr. Mark G. Pavlovich, Lois M. Johnson, and Ginger Coleman. Defendants moved to dismiss Plaintiff's Section 1983 claim and supplemental state law claims for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(1) (ECF No. 3).  The Court dismissed the Complaint with prejudice as to the state institutions and the individual defendant's suits in their official capacities, and without prejudice otherwise (ECF No. 10).  It further dismissed with prejudice Plaintiff's First Amendment retaliation claim against PASSHE and West Chester for lack of subject matter jurisdiction, and dismissed without prejudice Plaintiff's claims against the individual defendants under Section 1983.

Plaintiff filed an Amended Complaint on January 15, 2016 in which she asserted against Defendants West Chester, PASSHE, Mixner, Dowdy, Weisenstein, Pavlovich, and Johnson the same claims asserted in her original Complaint (ECF No. 16).  All Defendants moved pursuant to Rules 12(b)(1) and 12(b)(6) to dismiss the Amended Complaint (ECF No. 17).  The Court substantially granted the Motion; specifically, it dismissed Plaintiff's Section 1983 claims with prejudice against all Defendants except Mixner in his individual capacity, dismissed Plaintiff's Pennsylvania Whistleblower Law claims against all Defendants without prejudice to being refiled in state court, and dismissed without prejudice Plaintiff's intentional and negligent

4

infliction of emotional distress clams against all Defendants except Mixner (ECF No. 23).

Mixner filed a Motion for Summary Judgment on October 31, 2016 (ECF No. 29), to which Plaintiff responded on November 21, 2016 (ECF No. 31). In Plaintiff's response she withdrew her claims for intentional and negligent infliction of emotional distress. See Pl.'s Opp'n at 21 n.2. Mixner replied to Plaintiff's response on November 28, 2016 (ECF No. 33) and Plaintiff filed a surreply on December 5, 2016 (ECF No. 37). This Court held oral argument on February 10, 2017 on the Motion (ECF No. 45).

**III.    Legal Standard**

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." Id. at 325. After the moving party has met its initial burden, the adverse party's response must, "by citing to particular parts of materials in the record" set out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(c)(1)(A). "Speculation and conclusory allegations do not satisfy [the non-

moving party's] duty." Ridgewood Bd. of Educ. V. N.E. ex rel. M.E., 172 F.3d 238, 252 (3d Cir. 1999) (superseded by statute on other grounds as recognized by P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 730 (3d Cir. 2009)). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor." Id. Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson, 477 U.S. at 255.

## IV.   Discussion

### A.  Summary of Issues

The sole allegation remaining in this case is that Mixner violated Section 1983 by retaliating against Plaintiff due to her exercise of her First Amendment rights. Mixner moves for summary judgment on the ground that qualified immunity shields him from liability.[1]

Section 1983 provides a cause of action against persons who, acting under color of state law, subject any person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. "By its terms, of course, the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985). Thus, in the context of a plaintiff attempting to bring a Section 1983 claim on the basis of a constitutional violation, she must "demonstrate a violation of a right secured by the Constitution . . . [and] that the alleged

---

[1] Counsel for Mixner argued at oral argument that his Motion was grounded on three bases: (1) that Plaintiff did not engage in citizen speech, (2) that the Pickering balancing test favors the government, and (3) that Mixner's decision to terminate Plaintiff was not based on her speech. He characterized the qualified immunity analysis as pertaining to the first two bases. In fact, Mixner moved for summary judgment on qualified immunity alone. See Def.'s Mot. at 4 ("Mixner Is Entitled to Qualified Immunity on the First Amendment Claim"). Regardless, the inquiry as explained by Mixner's counsel involves the identical analysis as that under qualified immunity: whether a disputed issue of material fact exists regarding whether Plaintiff suffered a violation of her First Amendment rights, and, if so, whether the contours of that right were clearly established at the time of Mixner's unlawful conduct. We proceed to analyze the Motion on qualified immunity grounds.

deprivation was committed by a person acting under color of state law." Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995) (quoting Moore v. Tartler, 986 F.2d 682, 685 (3d Cir. 1993)).  As pertinent to the instant analysis, even where a plaintiff can meet this standard, the doctrine of qualified immunity may prevent her from obtaining civil damages "insofar as [the government actor's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Therefore, a plaintiff can only overcome the qualified immunity defense by showing "the officer's conduct [to have] violated a constitutional right," which right was clearly established at the time of the alleged violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  This doctrine exists to "'give[] ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" Hubbard v. Taylor, 538 F.3d 229, 236 (3d Cir. 2008) (quoting Gilles v. Davis, 427 F.3d 197, 203 (3d Cir. 2005)).

In this case, Plaintiff alleges that Mixner's decision not to reappoint her to Budget Director in June 2013 constituted retaliation for various instances of Plaintiff's protected speech. We must determine if Plaintiff has shown the existence of a genuine dispute of material fact regarding whether Mixner violated her rights under the First Amendment, and, if so, whether a reasonable jury could find that those rights were clearly established at the time he decided not to reappoint her.

### B.  Violation of a Federal Right

Plaintiff alleges that she engaged in speech protected under the First Amendment when she spoke out against West Chester's budget-making policy, and that Mixner retaliated against her on account of it by declining to reappoint her to her position.  In order to establish a First Amendment retaliation claim such as the one Plaintiff alleges, Plaintiff must show that her

speech was indeed protected by the First Amendment and that Mixner's decision was substantially motivated by that speech.  See Hill v. Borough of Kutztown, 455 F.3d 225, 241 (3d Cir. 2006).  The determination of whether Plaintiff's speech was protected is "is an issue of law for the court to decide."  Green v. Phila. Hous. Auth., 105 F.3d 882, 885 (3d Cir. 1997).  We find that Plaintiff's speech was protected, and that she has shown disputed issues of material fact as to whether Mixner terminated her on the basis of that speech.

### i.  Speech Protected by the First Amendment

"A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have 'an adequate justification for treating the employee differently from any other member of the general public' as a result of the statement [s]he made."  Id. at 241-42 (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)).

### 1.  Plaintiff Spoke as a Citizen

The Supreme Court has held that the dispositive factor in determining whether a public employee speaks as a citizen is whether the statement is made "pursuant to [her] official duties." Garcetti, 547 U.S. at 421.  The significance of that issue arises from the fact that to restrict this type of speech "does not infringe any liberties the employee might have enjoyed as a private citizen."  Id. at 421-22.  More recent Supreme Court jurisprudence has further elucidated that "speech that simply relates to public employment or concerns information learned in the course of public employment" is not necessarily un-protected employee speech.  Lane v. Franks, 134 S.Ct. 2369, 2379 (2014).  Indeed, such speech often "holds special value precisely because those employees gain knowledge of matters of public concern through their employment."  Id.  To determine if an individual's expression is citizen speech or employee speech, "[t]he proper

8

inquiry is a practical one," dependent on the facts of the particular case rather than on, for instance, solely the "employee's written job description."  Garcetti, 547 U.S. at 424.

Here, Plaintiff alleges three instances of protected speech: (1) her speech at the ABC meeting on September 20, 2012; (2) a memorandum she wrote dated September 27, 2012; and (3) her speech at the EMC meeting on October 29, 2014.  See Def.'s Mot., Ex. 5 (Pl.'s Responses to Interrogatories) at 4-5, ¶5.  Each of these expressions concerned the same topic – Plaintiff's concerns that the policy by which West Chester made its budget was misrepresentative of actual data and perhaps even fraudulent.  Mixner contends that Plaintiff voiced these concerns in the scope of her official job duties as Budget Director; he states that in each instance, Plaintiff "was speaking to an internal West Chester committee on a West Chester budget issue relating solely to the 'special knowledge' and 'experience' she acquired by virtue of her job duties."  Def.'s Mot. at 7.  Mixner characterizes Plaintiff's speech as clear employee speech because, as Budget Director, she was required to "[r]eview and recommend . . . changes to the [West Chester] budget allocation process" and that was "precisely what Plaintiff was doing in her cited instances of speech."  Id. at 8, n.3.  Plaintiff, on the other hand, describes the speech at issue as outside the scope of her duties because she was not charged with "investigat[ing] or report[ing] misrepresentations of financial information, . . . report[ing] to senior leaders of [West Chester] outside of her chain of command . . . unethical practices . . . [or] deliberate falsification of budget projections to maintain taxpayer funding."  Pl.'s Opp'n at 26-27.  We find that Plaintiff spoke as a citizen, not an employee.

Mixner relies primarily on Gorum v. Sessoms, 561 F.3d 179 (3d Cir. 2009) and Foraker v. Chaffinch, 501 F.3d 231 (3d Cir. 2007) to support his position.  In Gorum, a university professor claimed that his employer had retaliated against him for objecting to the selection of a

certain candidate for university president, disinviting that candidate from speaking at a campus event, and for advice and mentorship he gave to a university football player.  Gorum, 561 F.3d at 183-84.  The Third Circuit affirmed summary judgment in favor of the university, holding that the professor had spoken as an employee rather than as a citizen and that his speech was therefore not protected under the First Amendment.  See id. at 185-188.  The court reasoned that the "proper inquiry into what are an individual's official duties is a practical one" and that it was "misguided" for the professor to assert that, because his speech "went beyond his specified [job] responsibilities," he had spoken as a citizen.  Id. at 185 (internal quotations omitted) (quoting Garcetti, 547 U.S. at 424).

Under a practical inquiry, the professor's speech fell within his official job duties because, as to advising the football player, "[i]t was [the professor's] special knowledge of, and experience with, the [university's] disciplinary code that made him *de facto* advisor to all . . . students with disciplinary problems."  Id. at 186 (internal quotations omitted).  Regarding the revocation of the invitation to speak at the campus event, the court deemed that part of the professor's job duties, as well, due to the professor's responsibility for aiding "faculty and alumni involvement with student organizations and clubs."  Id.  Mixner cites Gorum to support his assertion that Plaintiff's expressions were made in her role as employee, because she would never have engaged in any of the allegedly protected speech if she were not Budget Director.  Def.'s Mot. at 9.  That is, "Plaintiff was only speaking to the ABC and EMC about budget issues by virtue of her position."  Id.  This argument misses the mark.  In Lane, the Supreme Court held that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."  Lane, 134 S.Ct. at 2379.  That holding altered Gorum's precedential value, and the Third Circuit has,

post-Lane, explained that Gorum stands for the proposition that "how the employee learned of the information [is] only one non-dispositive factor among many."  Flora v. Cnty. of Luzerne, 776 F.3d 169, 177 (3d Cir. 2015) (emphasis added).  Therefore, the fact that Plaintiff's speech concerned the subject matter of her employment is not determinative of this issue.

Apart from the language in Gorum about how the plaintiff gained knowledge of the subject matter of his speech, the case does not support Mixner's position.  Whereas in Gorum, the professor's day to day responsibilities included acting as a "de facto advisor" to students with disciplinary problems and the professor himself stated that he felt a "responsibility . . . as author of the disciplinary code to help students facing punishment," there is no such indication here that Plaintiff had any duty to report misrepresentations she discovered in the West Chester budget. Gorum, 561 F.3d. at 186.  That is, in both cases the plaintiffs' written job descriptions do not encompass the speech at issue, but in Gorum the reality of the professor's obligations included the speech, while here there is no record showing that Plaintiff had a duty to report what she considered malfeasance regarding the budget process.  Therefore, Gorum's impact on this analysis is limited to its holding that one non-dispositive factor tending to show that someone spoke as an employee is the fact that the plaintiff would not have engaged in the speech but for their position.

Mixner further cites Foraker as support for his argument that Plaintiff is taking an "overly narrow and fixed reading of what falls within her job duties."  Def.'s Mot. at 8.  In Foraker, two firearms instructors reported internally concerns they had regarding health and safety issues at the firing range where they worked, and faced adverse employment actions as a result.  Foraker, 501 F.3d at 238, abrogated on other grounds by Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379 (2011).  They alleged that they had been retaliated against on account of their speech, but the

11

court found that they had spoken pursuant to their official job duties and therefore that their speech was not protected by the First Amendment.  "Controlling" to the court's analysis in Foraker was that the plaintiffs were "expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command."  Id. at 241.  This focus on whether a First Amendment plaintiff had a duty to report misconduct or malfeasance was emphasized again in Dougherty v. School District of Philadelphia, 772 F.3d 979 (3d Cir. 2014), where the court considered a School District employee's communication with the Philadelphia Inquirer regarding alleged corruption by his employer and found it citizen speech because "nothing about [his] position compelled or called for him to provide or report this information." Id. at 988 (internal quotations omitted).

The court further noted that "[t]o the contrary, the School District appears to *discourage* such speech through its Code of Ethics' confidentiality provision."  Id.  Similarly here, Plaintiff was under no obligation to report what she considered misrepresentations or fraud in the West Chester budget even if it may have been one of her duties to point out areas for improvement and, indeed, she faced pushback when she reported it.  See DSOF ¶ 22 (following the September 20, 2012 meeting, "Mixner informed Plaintiff that he was not happy with her statements, that she put her credibility at risk and that he would now facilitate ABC meetings, instead of Plaintiff"). Just as in Dougherty and Foraker, we find it determinative that "while [Plaintiff] learned the relevant information because of [her] position, . . . there is no evidence suggesting it fell within the scope of [her] duties to recognize the alleged misconduct as such and report it."  Dougherty v. Sch. Dist. of Phila., No. 12-1001, 2013 WL 5525642, at *11 (E.D. Pa. Oct. 4, 2013).

Turning to the requirements of Plaintiff's job, it is undisputed that the Budget Director position involved "assist[ing] in the development and implementation of the capital budget" as

well as "[r]eview[ing] and recommend[ing], as requested, changes to the University's budget allocation processes." Cmplt., Ex. 3.[2] It is further undisputed that Plaintiff was "hired to review and recommend improvements to the budget process." DSOF ¶ 7. Mixner cites these facts as evidence that Plaintiff was charged with "offer[ing] budget guidance and even criticism," a characterization with which we agree. Def.'s Reply at 8. Where we diverge from Mixner's depiction of Plaintiff's role is in his conflation of Plaintiff's duty to critically engage with the budget making process and her duty to challenge the basic premises of that process on the grounds that it is unethical or even illegal. There is a difference between recommending changes to improve or streamline an existing policy and upending the policy with accusations that it is in itself fraudulent. The lack of any duty to report in Plaintiff's official job description or in her functional, day to day job responsibilities is dispositive to the instant analysis. Therefore, we cannot find, based on governing Supreme Court and Third Circuit precedent, that the instances of speech at issue in this case are "employee speech."

### 2. Plaintiff Spoke on a Matter of Public Concern

Having concluded that Plaintiff spoke as a citizen, we turn to the second prong of the First Amendment analysis, which asks whether the speech at issue involved a matter of public concern. We find that it did.

Whether speech involves a matter of public concern depends on if, "considering the 'content, form, and context of a given statement,' it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" Dougherty, 772 F.3d at 987 n.5 (quoting Connick v. Myers, 461 U.S. 138, 146 (1983)). The Supreme Court has held that "corruption in a public program and misuse of state funds . . . obviously involves a matter of

---

[2] We refer to exhibits from Plaintiff's original Complaint because in our Memorandum dated December 9, 2015, we stated that because Plaintiff had attached voluminous exhibits to her Complaint, she could refer to them rather than re-attach them to her Amended Complaint. See ECF No. 9.

significant public concern." <u>Lane</u>, 134 S.Ct. at 2380.  Lengthy prose are not necessary here, where Plaintiff has established that her speech concerned alleged misrepresentations in the West Chester budget that were intended to result in West Chester obtaining excess taxpayer funds, and where Mixner does not challenge this prong of the analysis.  We find that Plaintiff's speech involved a matter of public concern.

### 3.   Interest of Plaintiff and the Public Outweighs That of the State

Finally, we must consider whether Plaintiff's and the public's interest in the speech at issue outweighs West Chester's interest, as her employer, in running an efficient and functional workplace.  We find that Mixner has failed to show that West Chester's interest outweighs the significant interest of the public in statements, like Plaintiff's, exposing possible instances of public corruption.

Even where an employee expresses herself as a citizen on a matter of public concern, the court must still subject the speech to a balancing test before finding it "automatically privileged." <u>Guarnieri</u>, 564 U.S. at 386.  Specifically, the court must weigh "the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" <u>Id.</u> (quoting <u>Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty.</u>, 391 U.S. 563, 568 (1968)).  As to the employee's "side of the scale," we must consider not only Plaintiff's stake in the matter but also that of the public, which "has a significant interest in encouraging legitimate whistleblowing so that it may receive and evaluate information concerning the alleged abuses of . . . public officials." <u>Dougherty</u>, 772 F.3d at 991; <u>O'Donnell v. Yanchulis</u>, 875 F.2d 1059, 1062 (3d Cir. 1989).  We must further consider the government's "legitimate and countervailing interest, as an employer, in 'promoting workplace efficiency and avoiding workplace disruption.'" <u>Dougherty</u>, 772 F.3d at 991 (quoting

McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir. 2005)).  The Supreme Court has recognized the following factors as relevant to determine how substantial the government interest is:

> "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise."  Rankin v. McPherson, 483 U.S. 378, 388 (1987).

Here, Plaintiff characterizes her speech as "speech involving government impropriety," which, under Dougherty, "is the archetype of speech deserving the highest rung of First Amendment protection."  Pl.'s Surreply at 10; Dougherty, 772 F.3d at 991.  Mixner does not dispute that the content of Plaintiff's speech weighs in her favor but he argues that, regardless, Plaintiff harmed her working relationship with Mixner so significantly, "by choosing to openly and repeatedly undermine [him] in meetings," as to justify his decision not to reappoint her.  Def.'s Reply at 8.

We turn to a review of cases that faced a similar inquiry; namely, how to weigh an employee's and the public's interest in exposure of public corruption against the concomitant disruption such speech causes to employer-employee dynamics and working relationships.  In Sprague v. Fitzpatrick, 546 F.2d 560 (3d Cir. 1976), the court considered the effect of certain disparaging statements made by a First Assistant District Attorney about the District Attorney. The court held that because the former was an "alter ego" of the latter, and had "impugn[ed] [the District Attorney's] integrity in public," there was an "irreparable breach of confidence between the two men" and the ADA's termination was justified.  Id. at 565.  That stands in contrast to Dougherty, where the court held that the plaintiff's relationship with two individuals was not "the kind of close working relationship[] for which it can persuasively be claimed that personal loyalty and confidence are necessary to [its] proper functioning."  Dougherty, 772 F.3d at 992

(quoting Pickering, 391 U.S. at 570).  There, the plaintiff had shown that he did not interact directly with either supervisor until he was assigned to work on the project that led to the revelation of public corruption, and that his speech did not seriously disrupt the functioning of the School District.  Id. at 992-93 (noting that "[s]ome disruption is almost certainly inevitable").

Here, Mixner argues that Plaintiff undermined Mixner by "openly disagreeing with [his] budget assumptions [and] thwarting his ability to make a coherent presentation to these committees."  Def's Mot. at 11.  He points out that Plaintiff reported to him directly, which sways in favor of finding her disagreements with him disruptive to the functioning of the AMC and EMC.  Id.; Def.'s Reply at 9.  Plaintiff, on the other hand, argues that her tone was not insubordinate, and that Mixner left her no choice but to publicly voice her concerns regarding the budget making process because he refused to explain to her in private why the process was appropriate.  Pl.'s Opp'n at 29.

Plaintiff and Mixner undoubtedly had a close working relationship, as is evident in her official job description, which charged her with "work[ing] closely with [Mixner] on all University budget and financial matters."  Cmplt., Ex. 3.  In addition, Plaintiff reported to Mixner throughout her employment at Westchester and the two met on a weekly basis.  PSOF ¶ 13; Def.'s Mot., Ex. 1 (Pl.'s Dep. Tr.) at 30:19-21; DSOF ¶ 14.  Given those facts, and that Mixner had told Plaintiff to accept the budget making process as it existed, it is not surprising that Plaintiff's decision to ignore his direction and to bring up her concerns at the September 20, 2012 ABC meeting, created a strain between Plaintiff and Mixner.  Her continued complaining to him regarding the budget practices, and her statement two years later at the October 29, 2014 EMC meeting on the same topic likely further aggravated tensions.  We therefore agree with Mixner that Plaintiff's speech caused some level of disruption to their relationship and to the

functioning of the workplace.  But, we cannot find based on the undisputed facts on the record that this case is one in which Plaintiff's speech was "likely to impair discipline by superiors or harmony among co-workers, impede the performance of [her] daily duties, or interfere with the regular operation of the [department]."  Dougherty, 772 F.3d at 992.

First, we note the fact that two years passed between the initial instances of disruptive speech and the subsequent one as an indication that the working relationship between Plaintiff and Mixner was not so impaired as to be nonfunctional.  This is borne out by her performance reviews and by Mixner's decision to reappoint her to her position in June 2013.  See Pl.'s Opp'n, Exs. 2, 3 (performance evaluations covering period from 7/1/2012 to 6/30/2014); DSOF ¶ 27.  Second, there are fundamental differences between the instant facts and those present in Sprague, where the court found the plaintiff to be the District Attorney's "alter ego" and "second-in-command" due to his "primar[y] responsib[ility] for administration on a daily basis," among other duties.  Sprague, 546 F.2d at 562.  That is a far cry from Plaintiff's position at West Chester, where Plaintiff alleges she was routinely excluded from "meetings and strategic discussions" regarding her sphere of responsibility—the West Chester budget—by more senior members of the staff at West Chester and PASSHE.  PSOF ¶ 20; Def.'s Mot., Ex. 1 (Dep. Tr. of Pl.) at 33:9-20.  We further do not find persuasive Curinga v. City of Clairton, 357 F.3d 305 (3d Cir. 2004), in which the Pickering balancing test swayed in favor of the government because the plaintiff "occupied the most sensitive, high-level policy making appointive position in [the government employer's office]" and because the speech at issue had demonstrably impaired the functioning of the city council's operations.  Id. at 313.  In contrast, Plaintiff neither had a comparable level of authority within the budget department at West Chester nor did her speech cause a similar degree of disruption.

In light of the strong countervailing public interest in government employees like Plaintiff shedding light on what they believe to be instances of public corruption, Plaintiff's actions, although detrimental to her relationship with Mixner, were not so disruptive as to give him an independent justification for deciding not to reappoint her.

### ii. Plaintiff's Speech Was a Factor in the Alleged Retaliatory Action

Having established that Plaintiff's speech was protected under the First Amendment, the inquiry turns to whether it was that speech that caused Mixner to decide not to reappoint her. We find that there is a jury question as to whether it did.

Where a plaintiff has shown that her conduct was constitutionally protected, she must then demonstrate that "the protected activity 'was a substantial factor in the alleged retaliatory action.'" Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005) (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).  To establish that causal connection, the Third Circuit looks to proof of either "an unusually suggestive temporal proximity" between the speech and the adverse action, or "a pattern of antagonism coupled with timing." Lauren W. ex rel. Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007).  A plaintiff can also prove causation by showing that a reasonable jury could infer it from "the evidence gleaned from the record as a whole." Id. at 267 (quoting Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281 (3d Cir. 2000)).  "A defendant may defeat the plaintiff's claim by demonstrating that the defendant would have taken the same adverse action in the absence of [the] plaintiff's protected conduct." Hill v. Borough of Kutztown, 455 F.3d 225, 241 n.23 (3d Cir. 2006).

Mixner asserts that Plaintiff cannot show temporal proximity because she "beat a steady drum for over two years" regarding her allegations that the budget making process was corrupt, and faced no retaliation throughout that time period.  Def.'s Mot. at 13.  He points to the fact that

Plaintiff was reappointed to her position in June 2013 to further bolster the argument that he lacked retaliatory animus.  Id.  Mixner asserts that the true cause of the decision not to reappoint Plaintiff was Plaintiff's statement to Mixner "that she could no longer do the job and request[ed] a demotion at the same level of pay."  Id.  Plaintiff, on the other hand, agrees that she had been voicing concerns regarding corruption in the budget for two years but disputes that no retaliation occurred in that time period.  Pl.'s Opp'n at 32 (listing examples of the "ongoing diminishment of her role").  Plaintiff's key argument, though, is that her speech at the October 29, 2014 EMC meeting was of a fundamentally different character than her other expressions, and that it was that event that led Mixner to terminate her three weeks later.  Id. at 31.

We agree with Mixner that if two years indeed passed between Plaintiff's speech and Mixner's decision not to reappoint her, Plaintiff cannot show temporal proximity.  See Estate of Smith v. Marasco, 318 F.3d 497, 512 (3d Cir. 2003) (stating that "we have held that such an inference [of causation] could be drawn where two days passed between the protected activity and the alleged retaliation, but not where 19 months had elapsed") (internal citations omitted); Scrip v. Seneca, 651 F. App'x 107, 111-12 (3d Cir. 2016) (holding that a 17 month time period between the employee's protected speech and his termination could not support an inference of causation).  But, we consider Plaintiff's contention that her speech at the EMC three weeks prior to her termination was the true reason Mixner took the action he did.  Plaintiff argues that her expression at the October 29, 2014 EMC meeting was fundamentally different than her prior speech because the EMC was comprised of "senior leaders with good potential to address corruption."  Pl.'s Opp'n at 31.  At oral argument held in this Court on February 10, 2017, Plaintiff further elucidated her argument on this point.

The record shows that Plaintiff's speech at the EMC meeting involved University higher-

ups and may have reflected poorly on Mixner; therefore, it is plausible that Plaintiff's speech prompted him to take adverse action against Plaintiff that he would not otherwise have taken. See Def.'s Mot., Ex. 1 (Pl.'s Dep. Tr.) at 66:5-69:1 (describing the EMC meeting participants' reaction to Plaintiff's presentation of both budgets—the one based on the figures Mixner had approved and the one based on what Plaintiff alleges were the correct data points).  Plaintiff further stated at her deposition that after the EMC meeting, Mixner was angry with her.  Id. at 69:16-21.  This is borne out by the fact that at a meeting of the faculty leaders the next day, it was Mixner rather than Plaintiff who did the budget presentation due to an allegedly tense conversation between the two prior to the meeting wherein Plaintiff stated she would not present Mixner's budget without also presenting hers.  Id. at 70:4-71:22.  The above recounted testimony from Plaintiff indicates that the EMC meeting may have stirred tensions between Plaintiff and Mixner such that he was driven to terminate her.  We find that a reasonable jury could so conclude.

In addition, we note that what occurred at the November 4, 2014 meeting contains disputed issues of fact.  Mixner describes it as the true catalyst for his decision not to reappoint Plaintiff because Plaintiff requested a demotion at the same level of pay, while Plaintiff states that she made clear that her request was "[in] no way [her] saying that [she was] quitting [her] job."  Def.'s Mot. at 13, Ex. 1 (Pl.s Dep. Tr.) at 75:15-17. We find disputed facts exist as to what occurred at the meeting and therefore as to what the true motivating force was behind Mixner's decision not to reappoint Plaintiff.  For the foregoing reasons, whether Mixner violated Plaintiff's First Amendment rights is a jury question.

### C.  Federal Right Not Clearly Established

Having determined that disputed issues of material fact exist regarding whether Mixner

violated Plaintiff's First Amendment rights, we turn to the second prong of the qualified

immunity analysis, under which Mixner must show that "[his] conduct [did] not violate clearly

established statutory or constitutional rights of which a reasonable person would have known."

Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow, 457 U.S. at 818).  This aspect of

the standard ensures that the doctrine shields "all but the plainly incompetent or those who

knowingly violate the law."  Sharp v. Johnson, 669 F.3d 144, 159 (3d Cir. 2012) (quoting Malley

v. Briggs, 475 U.S. 335, 341 (1986)).  To determine if a right is "clearly established" the court

must "define the right allegedly violated at the appropriate level of specificity," an inquiry which

can include finding that "a general constitutional rule already identified in the decisional law

applies with obvious clarity."  Id.  That is, "the very action in question" need not have been

found previously unlawful, but, "in the light of pre-existing law, the unlawfulness must be

apparent."  Anderson, 483 U.S. at 640.

Here, Plaintiff must show that a reasonable person in Mixner's shoes would have known

that his decision not to reappoint Plaintiff constituted retaliation against her on account of her

engagement in protected speech.  Plaintiff primarily relies on McGreevy in support of her

contention that her right was clearly established.  In that case, the court held, in its analysis under

Pickering, that the defendants "ha[d] not proffered any legitimate countervailing interests in

limiting [the plaintiff's] speech" and that the plaintiff's interest therefore definitively outweighed

that of the government.  McGreevy, 413 F.3d at 367.  That finding was dispositive to the court's

conclusion that the plaintiff's right had been clearly established, which stands in contrast to the

instant case.  Here, although we find that Plaintiff had a greater interest in disclosure of her

complaints than the government did in silencing her, we do not conclude that "the balance of

cognizable interests weighs so heavily in [her] favor . . . [as to] make plain that the law is clearly

established." Id. at 367.  Because of that, McGreevy's impact on the instant inquiry is limited.

Having analyzed the cases cited by counsel in their briefs and in their letters to the court dated February 17, 2017, we do not find that the law was clearly established at the time of Mixner's allegedly retaliatory conduct.  To be clear, we do not need to identify, as Mixner contends, a "case announcing . . . that a budget director expressing budget concerns to internal committees at routine meetings might be citizen speech protected by the First Amendment." Def.'s Reply at 3.  The standard Mixner advocates is too narrow; the Supreme Court has been clear that "a case directly on point" is not required to render a right "clearly established" and that instead, "existing precedent must have placed the . . . constitutional question beyond debate." Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011).  No case cited by Plaintiff satisfies this standard. With respect to Dahlia v. Rodriguez, 735 F.3d 1060 (9th Cir. 2013), the case is neither controlling in this Circuit nor part of a "consensus of cases" capable of conveying to an employer like Mixner that, had he terminated Plaintiff for her speech, he would have been in violation of the First Amendment.  See Wilson v. Layne, 526 U.S. 603, 617 (1999) (for law to be clearly established it must be "controlling authority" in the jurisdiction in which the case is pending, or there must be a "consensus of cases of persuasive authority" establishing such law).

Neither counsel nor the Court have uncovered any Supreme Court or Third Circuit precedent concluding that an employer was in violation of the First Amendment for terminating an employee who reported internally what she considered to be instances of public corruption under similar circumstances to these.  In Dougherty, the law was deemed clearly established because the plaintiff's speech was made to a newspaper, "as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship." Dougherty, 772 F.3d at 993-94.  Here, in contrast, Plaintiff disclosed her

suspicions internally rather than to a media outlet.  In addition, Plaintiff had a working

relationship with Mixner that was significantly closer than the one in Dougherty, where the

employee had never even spoken to the defendant prior to their work on the allegedly corrupt

project.  See id. at 992.  Although we ultimately found, as discussed above, Plaintiff's speech to

be protected, our conclusion resulted from a searching analysis of the facts and governing

precedent, and cannot be said to have been compelled by "clearly established law."  Dougherty

therefore is not supportive of Plaintiff's argument.

    In addition, we note the recent precedential decision by the Third Circuit in Williams v.

Secretary Pennsylvania Department of Corrections, ___ F.3d ___, No. 14-1469, 2017 WL

526483 (3d Cir. Feb. 9, 2017), which considered a death row prisoner's allegation that certain

prison officials violated his due process rights by continuing to house him in solitary

confinement even after he had been granted a resentencing hearing.  Id. at *1.  Our appellate

court agreed that although the plaintiff's due process rights had been violated, the defendants

were entitled to qualified immunity because the law was not clearly established at the time of the

unconstitutional conduct.  Id. at *15.  Although precedent existing at the time of the

constitutional violation was "consistent with, and does support, [the] [p]laintiffs' claim that they

had a protected liberty interest[, it was not] . . . sufficient to clearly establish [the] [p]laintiffs'

due process interest in avoiding confinement on death row."  Id. at *14 (emphasis in original).

That determination was based on the existence of other law in effect at the time, such as a state

statute and Department of Corrections' implementing policy that "gave [the] [d]efendants reason

to believe their actions were lawful."  Id. at *15.  Specifically, the appellate court concluded that

the implementing policy of 61 Pa.C.S.A. Section 4304 was susceptible to the reasonable

interpretation that a prisoner on death row was not to be removed from death row until the

prisoner's sentence was modified.  Id.  The court held that the defendants' decision to maintain

the prisoners on death row, at a time when their sentences had not yet been modified, constituted

reasonable adherence to the policy then in place and therefore was not violative of clearly

established law.  Id. at *16.

Williams provides further support for our conclusion on this prong of the qualified

immunity analysis.  Just as other binding law existed at the time of the prison officials' conduct

that allowed for "breathing room to make reasonable but mistaken judgments about open legal

questions," here, too, Mixner could reasonably have relied on Gorum, Foraker, and Dougherty,

to protect him from liability for his actions.  Lane, 134 S.Ct. at 2381 (quoting Ashcroft, 563 U.S.

at 743).  Even if Mixner was not aware of these specific decisions, we cannot ignore them when

he relies on qualified immunity as a defense.  A government employer in Mixner's position

could have reasonably concluded that Plaintiff's speech, being as it was on the subject matter of

her position and made within the workplace at meetings which she was required to attend, was

not protected under the First Amendment.  We note that even though we earlier found that

Plaintiff spoke as a citizen, the test on qualified immunity is distinct and goes to the

understanding of a reasonable person in Defendant's position at the time of his conduct.  It

demands the conclusion that to decide not to reappoint Plaintiff was not a "clearly established"

violation of Plaintiff's First Amendment rights.

Finally, we agree with Mixner that important to our analysis is the Third Circuit's

statement in June 2016 that it was undecided in this Circuit "whether speech that occurs within

the workplace, but outside the 'chain of command' is official speech . . . or private citizen

speech."  Scrip, 651 F. App'x at 110.  The speech described in Scrip is exactly the speech that

occurred here—Plaintiff indisputably spoke within the workplace to individuals outside her

chain of command.  See Pl.'s Opp'n at 27 (noting that Plaintiff "chose to report and expose the misconduct internally to University Leaders outside of the inner circle <u>and her chain of command</u>") (emphasis added).  The court in <u>Scrip</u> declined to decide the issue, instead resolving the case on causation grounds.  <u>Scrip</u>, 651 F. App'x at 110.  Although <u>Scrip</u> is a non-precedential decision, and we therefore are not bound to decide this issue on its reasoning, the fact that our Third Circuit Court of Appeals in 2016 found it unclear whether the type of speech Plaintiff engaged in was protected, is a key factor to consider in determining that the law on which Plaintiff relies was not clearly established in 2014.

In sum, we find that Mixner is entitled to qualified immunity on Plaintiff's Section 1983 claim because, at the time it occurred, Mixner's conduct did not violate a clearly established federal right.

## V.    CONCLUSION

For the reasons explained above, Plaintiff has failed to demonstrate a genuine issue of material fact for her Section 1983 claim, which is the only one remaining in this case.  An appropriate Order will follow granting Mixner's Motion for Summary Judgment in its entirety, and dismissing all Counts with prejudice.  The Order will additionally deny as moot Mixner's Motion to Continue Trial Date (ECF No. 35).

O:\Cecily.2016\Bradley v. Westchester (15-2681)\Memo re MSJ.docx